# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

STEVEN JUDE,               Plaintiff,

    -against-

KEVIN J. BROWN, DEPUTY SUPERINTENDENT OF
SECURITY AT WENDE; DANYELLE HODGES,
CORRECTIONAL CAPTAIN AT WENDE;
MARGARET STRIK, MENTAL HEALTH UNIT CHIEF
AT WENDE; DEANNA HUNT, RECREATIONAL
LEADER AT WENDE; KEVIN BARLOW,
CORRECTIONAL SERGEANT AT WENDE; STEVEN
KOSTYSZYN, CORRECTIONAL OFFICER AT
WENDE; CARMEN BURKHAURT, CORRECTIONAL
OFFICER AT WENDE; JOHN and JANE DOES, "1"
Through "5" individually (the names John and Jane Does
being fictitious, as the true names are presently unknown)

                Defendants.

**VERIFIED
COMPLAINT**

**JURY TRIAL DEMANDED**

Civ #





21   CV 654

Plaintiff, STEVEN JUDE, acting pro-se as for a Verified Complaint respectfully set froth and alleges upon information and belief:

## PRELIMINARY STATEMENT

This is a civil rights action in which plaintiff, a legally blind (51) fifty-old year old man currently entrusted to the care, custody and control of the New York State Department of Corrections and Community supervision, "DOCCS", seeks relief for the defendants violations, under color of state law of rights, privileges, and immunities secured by 42 § 1983; The First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution; and the Constitutional laws of the State of New York, by defendants, individually, jointly and severely subjecting plaintiff to *inter alia*, cruel and unusual punishment, deliberate indifference, failure to protect, wrongful confinement, Negligence, Gross Negligence, Negligent and Intentional Infliction of emotional distress causing substantial permanent physical and mental injuries.

## PARTIES

2.     Plaintiff STEVEN JUDE, is and was at all times relevant herein an adult citizen of the United States of America and resident of the State of New York currently incarcerated at Wende Correctional facility located at 3040 Wende Rd. P.O. Box 1187, Alden, New York 14004.

3.      Defendant Kevin J. Brown, is and was at all times relevant herein the duly appointed, qualified acting Deputy Superintendent of Security at Wende, who participated in, had actual or constructive knowledge of, and/or failed to protect plaintiff from a substantial risk of harm from known Security Risk Group, "SRG" safety threat gang members with a propensity for violence. Defendant Brown was charged with the formulation and implementation of directives, policies and procedures related to Security at Wende and the protection and treatment of inmates by "DOCCS" custodial staff, housing, classification, job and program assignments. Defendant Brown was responsible for the training, supervision and discipline of Security custodial staff regarding issues of the proper protection of inmates from abuse and/or mistreatment by staff and inmates alike, and responding to an assault being committed on an inmate by an inmate and conducting investigations of allegations of abuse and/or mistreatment and assault. Defendant Brown acquiesce in a pattern and practice of constitutional violations against inmates and gross negligent supervision allowed, and even encouraged the illegal misconduct as alleged herein, as Wende security custodial staff knew that they could act with impunity, unlawfully file falsified fabricated disciplinary and incidents reports in violation of 18 U.S.C. § 1519, and cover up their illegal wrongful acts by acting outside the scope of their duties, break policy and procedure and there would be no kind substantiated investigation and/or repercussions. Defendant Brown exhibited deliberate indifference to the rights of inmates by authorizing his staff to utilize known "SRG" safety threat members as porters, and assisted in creating and/or increasing the danger to plaintiff, failing to install video surveillance cameras on housing units/tiers, failing to exercise reasonable and ordinary care to prevent violence between inmates, failing to have staff wear body cameras, failing to prosecute inmates for assault on inmates, and failing to act on information indicating unconstitutional acts were occurring, allowed the continuance of such a policy or custom and failed to remedy the wrong after being informed. Defendant Browns duties were to be carried out in a manner consistent with the legal mandates that govern the operation of "DOCCS" facilities, including it policies, procedures and protocols, as well as with all relevant local, state, and federal statues and regulations. Defendant Brown is being sued in his individual capacity and as a "DOCCS" employee. At all times mentioned Defendant Brown acted within the course and scope of his employment and under color if law.

4.      Defendant Danyelle Hodges, is and was at all times relevant herein the duly appointed, qualified acting Correctional Captain at Wende, who participated in, had actual or constructive knowledge of, and/or failed to protect plaintiff from a substantial risk of harm from known Security

Risk Group, "SRG" safety threat gang members with a propensity for violence. Defendant Hodges was charged with the formulation and implementation of directives, policies and procedures related to Security at Wende and the protection and treatment of inmates by "DOCCS" custodial staff, housing, classification, job and program assignments. Defendant Hodges was responsible for the training, supervision and discipline of Security custodial staff regarding issues of the proper protection of inmates from abuse and/or mistreatment by staff and inmates alike, and responding to an assault being committed on an inmate by an inmate and conducting investigations of allegations of abuse and/or mistreatment and assault. Defendant Hodges acquiesce in a pattern and practice of constitutional violations against inmates and gross negligent supervision allowed, and even encouraged the illegal misconduct as alleged herein, as Wende custodial staff knew that they could act with impunity, unlawfully file falsified fabricated disciplinary and incident reports in violation of 18 U.S.C. § 1519, and cover up their illegal wrongful acts by acting outside the scope of their duties, break policy and procedure and there would be no kind substantiated investigation and/or repercussions. Defendant Hodges exhibited deliberate indifference to the rights of inmates by authorizing her staff to utilize "SRG" safety threat members as porters, failing to install video surveillance cameras on housing units/tiers, failing to exercise reasonable and ordinary care to prevent violence between inmates, and assisted in creating and/or increasing the danger to plaintiff, failing to prosecute inmates for assault on inmates, failing to have staff wear body cameras and failing to act on information indicating unconstitutional acts were occurring, allowed the continuance of such a policy or custom and failed to remedy the wrong after being informed. Defendant Hodges duties were to be carried out in a manner consistent with the legal mandates that govern the operation of "DOCCS" facilities, including it policies, procedures and protocols, as well as with all relevant local, state, and federal statues and regulations. Defendant Hodges is being sued in her individual capacity and as a "DOCCS" employee. At all times mentioned Defendant Hodges acted within the course and scope of her employment and under color if law.

5.      Defendant Margaret Strik, is and was at all times relevant herein a Mental Health Unit Chief at Wende for the Office of Mental Health, "OMH" who participated in, had actual or constructive knowledge of, and/ or failed to act to protect plaintiff from abuse and/or a substantial risk of harm from Known Security Risk Group, "SRG" safety threat gang members with a propensity for violence. Defendant Strik was designated with supervisory responsibility of Mental Health staff at Wende and the development of policies and procedures to provide reasonable safety and Mental Health care to

inmates at Wende pursuant to the contract with "OMH" and "DOCCS" and the Eighth Amendment of the United States constitution and other applicable laws and to conduct investigations of abuse and/or mistreatment of inmates on the Mental Health case load, and ensuring that threats to a inmates health or safety communicated to her is forwarded to the appropriate Security Staff at Wende for the appropriate action. Defendant Stirk exhibited deliberate indifference to the rights of inmates by failing to act on information that indicated unconstitutional acts were occurring, failing to investigate, and assisted in creating and/or increasing the danger to plaintiff, allowed the continuance of such a policy or custom and failed to remedy the wrong after being informed. Defendant Stirks duties were to be carried out in a manner consistent with the legal mandates that govern the operation of "DOCCS" facilities and the Office of Mental Health and Mental Hygiene Law, "MHL", including its policies, procedures and protocols, as well as with all relevant local, state, and federal statutes and regulations. Defendant Stirk is being sued in her individual capacity and as contracted personnel of "DOCCS" through "OMH". At all times mentioned herein Defendant Strik acted within the course and scope of her employment and under color of law.

6.     Defendant Deanna Hunt, is and was at all times relevant herein a recreation leader III at Wende, who was designated to conduct a Superintendent Tier III Superintendents hearing for two falsified fabricated disciplinary reports issued to plaintiff in retaliation for his protected speech and to cover-up the illegal wrongful conduct and breach of duty by Defendants custodial staff, who failed to protect plaintiff from a vicious brutal assault and permitted the assault to occur by "SRG" safety threat members. Defendant Hunt was never properly trained to conduct Superintendents hearings and violated clearly established constitutional Due process rights of the plaintiff which she knew or should have known by refusing to entertain plaintiff objections and insisted on trying to cover for co-workers, failed to allow plaintiff to introduce exculpatory evidence, and refused to hear or acknowledge that the disciplinary proceedings was untimely, the requested extensions to start and end hearing was invalid and plaintiff was never served with a misbehavior report prior to the commencement of the hearing in accordance to 7 NYCRR 254, and that he was the victim of an assault and set up. Defendant Hunt accepted without question the chorology of events set forth in the falsified fabricated reports i.e. that plaintiff attacked inmate Montour and initiated and engaged in a mutual combat, although there was no fight and plaintiff injuries and the evidence were consistent with being the victim of an assault, and not the assailant and failed to allow plaintiff to introduce recorded and documentary evidence and prejudge plaintiff guilt. Defendant Hunt denied plaintiff to introduce exculpatory evidence of recorded

4

calls made from his pin registry number phone list that were made during a time when plaintiff was outside at the hospital which calls were made by one of the inmates who arranged the assault, which recorded conversations was critical to the merits of plaintiffs defense that he never assaulted no one and was instead set up and assaulted in retaliation for his protected speech, in which the inmate is recorded stating "why the assault occurred on plaintiff and the defendant officers role" which evidence challenged the officers rendition of falsified fabricated reports which deprived plaintiff of an full and fair opportunity to litigate his claims. Defendant Hunt refused to present asked questions from plaintiff to witnesses, justified their actions and never issued plaintiff a rendered written disposition or witness refusal forms and was sometimes hostile and bias towards plaintiff, and Defendant Hunts credibility determination she made was between her co-workers and plaintiff a prisoner who she attempted to slander, discredit and belittle as if he had an conspiracy theory of what occurred to him and prejudged his guilt. Defendant Hunts duties were to be carried out in a manner consistent with the legal mandates that govern tier III Superintendent Hearings in accordance to title 7 NYCRR 254, and "DOCCS" facilities, including its policies, procedures and protocols, as well as with all relevant local, state, and federal statutes and regulations. Defendant Hunt is being sued in her individual capacity and as an employee of "DOCCS". At all times mentioned Defendant Hunt acted within the course and scope of her employment and under color of law.

7.      Defendant Kevin Barlow, is and was at all times relevant herein a correctional Sergeant at Wende, who participated in, had actual or constructive knowledge of and/or failed to act to protect plaintiff from a substantial risk of harm from known Security Risk Group, "SRG" safety threat gang members with a propensity for violence. Defendant Barlow was designated with the responsibility of care, custody and control of inmates and first line supervision of custodial security staff at Wende. Defendant Barlow was partly responsible for the attack and assault and battery on plaintiff and conspired with Defendant subordinate officers in violating plaintiffs civil and constitutional rights and file falsified fabricated reports in violation of 18 U.S.C. § 1519, Defendant Barlow authorized custodial staff to recruit "SRG" safety threat gang members as porters and the corollary pattern and practices of retaliation and illegal misconduct by custodial staff. Defendant Barlow's acquiesce in a pattern and practice of cover-ups of custodial staff misconduct he supervised and constitutional violations against inmates and malfeasance and gross negligent supervision allowed, and even encouraged the illegal unlawful conduct as alleged herein, as Wende staff knew that they could act

5

with impunity and unlawfully file falsified fabricated reports and cover-up their wrongful conduct by acting outside the scope of their duties, break policy and procedure and there would be no kind of substantiated investigations and/or repercussions. Defendant Barlow exhibited deliberate indifference to the rights of inmates by failing to adequately supervise custodial staff, authorizing custodial staff to utilize "SRG" safety threat members as porters, assisted in creating and/or increasing the danger to plaintiff, failing to exercise reasonable and ordinary care to prevent violence between inmates, failing to prosecute inmates for assault on inmates, and failing to act on information indicating unconstitutional acts were occurring, allowed the continuance of such a policy or custom and failed to remedy the wrong after being informed. Defendant Barlow duties were to be carried out in a manner consistent with the legal mandates that govern the operation of "DOCCS" facilities, including its policies, procedures and protocols, as well as with all relevant local, state, and federal statutes and regulations. Defendant Barlow is being sued on his individual capacity and as an employee of "DOCCS". At all times mentioned Defendant Barlow acted within the course and scope of his employment and under color of law.

8.      Defendants Steven Kostyszyn, Carmen Burkhart, Jane Doe is and was at all times relevant herein correction  officers employed by "DOCCS" at Wende, designated with the responsibility of care, custody and control of inmates, and to protect the health and safety of inmates within his/her charge. Defendant officers participated in, had actual and constructive knowledge of, and/or failed to act to protect plaintiff from a substantial risk of harm from known Security Risk Group, "SRG" safety threat members with a propensity for violence. Defendants malfeasance, and omissions, caused, created and resulted in plaintiff being brutally assaulted, and observed it happening, and allowed it to occur and failed to intervene and/or issue any verbal commands and/or activate their body alarms preventing assistance in violation of "DOCCS" policy and procedure, and other applicable laws, permitting plaintiff to be viciously and maliciously assaulted by his assailants who repeatedly struck and beat plaintiff about the face, head and body rendering him unconscious. Defendants knew plaintiff faced a substantial risk of harm from known "SRG" safety threat members from the Crips and permitted them to lock out of their cells under the pretense of porters to assault plaintiff in retaliation for his protected speech, placing these inmates in positions of `supervisory and/or disciplinary authority over other inmates, and failed to exercise the adequate care to prevent that which was reasonably foreseeable and that a reasonable prudent correction officer would have exercised in a similar situation. Defendant officers acted outside the scope of their duties with their illegal

misconduct and subjected plaintiff to cruel and unusual punishment by allowing him to be brutally assaulted and failing to protect him during the assault and unlawfully falsifying disciplinary and incident reports in violation of 18 U.S.C. § 1519, in an effort to conceal their illegal misconduct, and malfeasance, which resulted in plaintiff being confined to solitary confinement and suffering intentional infliction of emotional distress and be denied the appropriate reasonable accommodations for his disability, and robbed of all his personal property. Defendants knew that they could break policy and procedure and file falsified fabricated reports and cover up their unlawful conduct and act with impunity and that there would be no real substantiated investigation and/or repercussions. Defendant officers exhibited deliberate indifference to the rights of inmates by disregarding a risk to inmates' safety by allowing "SRG" members to lock out of their cell and function as porters and assisted in creating and/or increasing the danger to plaintiff, failing to exercise reasonable and ordinary care to prevent violence between inmates. Defendant's duties were to be carried out in a manner consistent with the legal mandates that govern the operation of "DOCCS" facilities, including its policies, procedures and protocols, as well as with all relevant local, state, and federal statues and regulations. At all times all Defendants are being sued in their individual capacities, and as "DOCCS" employees. At all times mentioned Defendants acted within the course and scope of their employment and under color of law.

9.     Upon Information and belief, the individually name defendants John and Jane Does "1" through "5", the true names being fictitious was in some manner negligently and was proximately responsible for events and happenings as alleged herein and for plaintiff injuries and damages.

10. That at all times hereinafter mentioned defendants were acting under color of state law and/or in compliance with the official, rules, regulations, laws, statues, customs, usages and/or practices of the State of New York and/or Department of Corrections and Community Supervision.

NOTICE OF CLAIM

11.     On or about January 19, 2021, within (90) days after the claim accured, plaintiff duly served by certified mail return receipt a Notice of claim with the NYS Attorney General Letitia James setting forth all facts and information required under General Municipal law 50-e.

7

12.     The State of New York has wholly refused to investigate and/or make an adjustment and/or payment thereof and more than (30) days have elapsed since the presentation of the Notice of claim #7011-0470-0002-6563-60006, certified mail return receipt.

13.     Plaintiff has complied with all the laws, statutes and conditions precedent to the maintaining the instant action.

## JURISIDICTION AND VENUE

14.     Plaintiff institutes these proceedings pursuant to 42 U.S.C.A. §§§ 1983, 1985 and 1988 to obtain compensatory and punitive damages as defendants conduct was egregious, outrageous and committed with malice and oppression, and to obtain the cost of suit, including but limited to reasonable attorney fees, and damages for the injuries suffered by Plaintiff and caused by defendants violation of rights guaranteed by the First, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States and by State and Federal law, and particularly 42 U.S.C.A 1983.

15.     Venue is properly laid in this District under 28 U.S. 1391(b)(2) this being the District in which the claim arose.

16.     Plaintiff claims for injunction relief are authorized by rule 65 of the Federal Rules of Civil Procedure.

17.     This Court also has jurisdiction of this action under 28 U.S.C. 1331 and 1343(a)(3) and (a)(4) this being an action seeking redress of violations of rights under the Amendments of the Constitution of the United States and the State of New York.

18.     Upon information and belief "DOCCS" receives federal funding to operate its correctional facilities, and Title II of the Americans with Disabilities act of 1990 and Rehabilitation Act of 1973, section 504 Apply, This action arises and is brought pursuant to 42 § 1983 with pendant State law Claims.

19.     Supplemental Jurisdiction is conferred upon the Court over any and all State law claims that are so related to the Federal that they form apart of the same case or nucleus of operative fact under 28 U.S.C. 1367 (a) and the "Supremacy Clause" See: Morris v. Eversley, 205 F. Supp. 2d 234; Haywood v. Drown, 556 U.S. 729. Federal and State law together form one system of jurisprudence which constitutes the law of the land and of the State, and this Court has jurisdiction over and for Plaintiffs' State law Claims.

## TRIAL BY JURY

20.     Plaintiff demands a trial by jury on each and every one of his claims as pled herein pursuant to Fed. R. Civ P. 38(b).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

21.     In accordance to 42 § U.S.C. 1997 (a) plaintiff has complied with the Exhaustion requirements in which the I.G.R.C. Supervisor J. Krygier, at Wende and Director of "IGP" Shelly Mallozzi has put up obstacles in an effort to hinder, frustrate and interfere with plaintiff access to the Courts and thwarting plaintiff from fully and properly exhausting his administrative remedies in accordance to 7 NYCRR part 701 and DOCCS Directive 4040 and 4041, in addition CORC has failed to notify him by date stamped notice stating when his code (49) grievances was received by CORC, however after inquiring with J. Krygier at Wende, plaintiff grievances WDE-0604-20 was sent to CORC on 1/20/21, WDE-0031-21, was sent 1/28/21 and WDE-0052-21 on 2/2/21/ **CORC has thirty (30) calendar days after receipt of the appeals to issue a final decision**, and has failed to comply with the regulation, policies and procedures, and/or rules set forth for DOCCS and its inmate grievance program, and plaintiff has done everything the "DOOCS requires of him and assumes the administrative remedies have been exhausted, is either not available and/or a different administrative remedy applies to his situation and has no clue as to what he should do, which there is no "next step" and the grievance procedures operates as a simple dead end, by the prison officials consistently, unwillingly unable to provide any relief.

## STATEMENT OF CLAIM

22.     At all relevant times herein, defendants were "persons" for the purpose of 42 U.S.C. § 1983 and acted under color of law to deprive plaintiff of his constitutional and civil rights, as set forth more fully below.

## FACTUAL ALLEGATIONS

23.     On or about 12/23/ 20 at approximately 12:45pm at Wende, D-Block 24 company a designated housing unit/tier and "special unit" for vulnerable Sensorial Disable Legally Blind and Severely Visually Impaired, "LB/SVI" inmates in the Sensorial Disable Program, "SDP" the person of plaintiff, STEVEN JUDE was caused to negligently, carelessly and recklessly come into harmful contact with the person of inmate Rudy Montour #12-A-3637 and John Roberts #08-A-3491.

24.     On or about 12/23/20 and at all times afterwards, the acts of inmate Rudy Montour and John Roberts were intended to make violent contact with plaintiff Steven Jude.

25.    On or about 12/23/20 and at all relevant times afterwards, Defendant officers Kostyszyn, Burkhart, Jane Doe and Sergeant Barlows malfeasance, and omissions, caused, created and resulted in the actions by inmate Montour and Roberts, Known Security Risk Group, "SRG" safety threat members from the Crips succeeding in making actual physical violent contact with the plaintiff STEVEN JUDE.

26.    On or about 12/23/20, Inmate Montour and Roberts, Known Dangerous "SRG" safety threat members made violent physical contact with plaintiff STEVEN JUDE, a vulnerable legally blind, multi-disable elderly inmate, by viciously and maliciously beating, stomping, and kicking him about the head, face, and body, rendering him unconscious, causing sufficiently serious injuries which required hospitalization.

27.    The above-mentioned battery was initiated by inmate Roberts and Montour and upon the order and directions of Defendants Kostyszyn and Burkhart, in retaliation for plaintiff filing grievances about the denial of reasonable accommodations and writing letters of complaints to Defendants Strik, Mental Health Unit Chief, Deputy Superintendent Brown, and Superintendent Eckert, about staff misconduct and fearing for his safety and abuse/mistreatment by a "SRG" safety threat member Roberts and other Crips who assaulted plaintiff on the tier on or about 12/18/20, amongst other egregious offenses.

28.    Inmate Montour and Roberts and Correction Officers Kostyszyn, Jane Doe and Burkhart, and Sgt. Barlow, acted in concert and conspired before and after during the attack and the remaining other reference agents and/or employees, acted intentionally to conceal the facts subsequent to the gang assault, all of which were willful and in wonton disregard to the safety, well-being and legal rights of the plaintiff, STEVEN JUDE, and to the further extent that these actions were intentional, reflect that the defendants was grossly negligent with respect to its duties and obligations to plaintiff.

29.    On or about 12/23/20, defendants, each and every of them combined to engage in a scheme in furtherance of an attempt to cover-up the truth and secreted the scheme to inflict bodily harm against, and/or injury on plaintiff, falsified reports indicating plaintiff had initiated and engaged in mutual combat with inmate Montour in an feeble attempt to justify plaintiffs injuries, in addition, to add insult to injury, alleged two weapons were found subsequently after the incident in plaintiffs cell, to further obscure the facts and prevent plaintiff from pressing charges, in which defendant Barlow adherently adopted without investigating, and/or reporting accurately, causing falsified disciplinary charges to be lodged against plaintiff and unlawfully confined in solitary confinement and have all of his property stolen and denied reasonable accommodations for his disability.

30.     Defendant Kostyszyn, Barlow and the remaining referenced agents and/or employee conduct was willful, wanton, reckless, malicious and/or exhibited a gross indifference to, gross negligence and with a callous disregard for human life, safety and rights of others, and more particularly, the rights, life and safety of plaintiff STEVEN JUDE.

31.     At all times mentioned, the individually named defendants were charged with the duty to protect the welfare and safety of plaintiff, who was entrusted to the care, custody and control of "DOCCS" under the authority of law.

32.     At all times mentioned the individually named defendants and the remaining reference agents and/or employees owed a duty to employ reasonable care and measures to protect plaintiff from violence by other prisoners.

33.     The Defendants and the remaining reference agents and/or employees individually breached the above duties which were tantamount to gross and/or wanton negligence as more fully described and set forth below.

34.     On or about 12/19/20 and 12/21/20 plaintiff as well as others similarly situated wrote letters to Defendant Strik, Brown and Superintendent Eckert regarding an able-bodied "SRG" safety threat Crips gang member, John Roberts threatening violence against sensorial disable inmates, stealing property, extorting and intimidating them with weapons and having committed an assault on plaintiff on or about 12/18/20 which caused his noise to bleed amongst other egregious offenses in which plaintiff opposed being oppressed and taken advantage of and/or abused.

35.     Defendant Barlow authorized Defendant officers Kostyszyn, Burkhart and other security custodial staff to allow Roberts to lock out of his cell and run around the block unsupervised and function as "porter on 24 company, when he was not, who was a known confidential informant for officers, who he acted as an "enforcer" for.

36. A "porter" is a inmate assigned to perform various functions within the block· or specific tier/housing unit unsupervised, including, among other things, cleaning, passing out water and food trays and was also once referred to as an "Trusty" and therefore granted special privileges and perks that other inmates were not afforded.

37.     Inmates Montour and Roberts, Known Dangerous "SRG" safety threat members from the Crips with a propensity for violence, should have been prohibited from locking on a housing unit and/or tier designated for legally blind and severely visually impaired inmates and from being able to lock out of their cells and function as porters due to their Security Risk Group classification and gang affiliation.

38.     On or about 12/23/20 at Approximately 10:30pm Defendant Barlow, the D-Block area supervisor summoned plaintiff to the front of 24 company regarding complaints received by the Acting Deputy Superintendent of Security Defendant Hodges which was sent by plaintiff and other inmates concerning plaintiff safety being at risk from Security Risk Group safety threat gang members.

39.     Defendant Barlow stated "Security" had received these letters alleging that plaintiff had hot scolding liquid thrown in his face, a bucket of dirty bucket of mop water with urine and feces thrown in his cell, and was punched in the noise on the company/tier causing his noise to bleed, which allegedly the officers allowed to occur and failed to report due to it being an regular occurrence.

40.     Defendant Barlow informed plaintiff that he could not careless if inmates killed each other as long as his staff was not touched, which was his paramount concern, and advised plaintiff to either get with the program, stop filing grievances and complaints or else he could easily find himself back on keep lock or officers could find a weapon in his cell and returned to "SHU".

41.     Defendant Barlow advised plaintiff to ask his fellow convicts of what happens to inmates who like to file grievances and complaints at Wende and attempted to discredit plaintiffs fear for his life and safety by stating he did not believe that the problem plaintiff was well as others wrote about was that serious, due to is being an regular occurrence at Wende.

42.     Plaintiff being in a state of emotional duress, and feeling offended by Defendant Barlows negative response, directly and indirectly threatening him with retaliation to secure his silence, and the blatant disregard for his safety apprised defendant Barlow about his qualms with regards to having to live under a very unsafe, extremely hostile environment on a disable housing unit in which his safety and life would be further endangered if he or Roberts was not moved due to the serious conflict he was having with Roberts.

43.     Defendant Barlow advised plaintiff that he was unable to move anybody at that time due to D-Block being on quarantine lock down due to over 60 or more inmates testing positive for Covid-19 within the Block, and told plaintiff to go lock back in, and that he would see what he could do after consulting with Defendant Hodges the acting Deputy Superintendent of Security.

44.     Defendant Barlow knew or should have known about the threat and risk of harm to Mr. Jude's safety, by the offenses that were already committed against him, which knowledge came from plaintiff as well as other sources that plaintiff as well as others similarly situated suffered significant abuse, physical as well as emotional injuries due to exposure to gang violence from Known "SRG" safety

threat members on a Sensorial Disable Unit, "SDU which suppose to be relatively safe, and actively disregarded that risk and immediately left the block.

45.    Defendant Barlow called defendant Burkhart the D-block Desk officer/Hall Captain about a half hour later instructing him to have inmate Roberts cell searched, and locked in, declaring that "Roberts could no longer lock out his cell and function as porter due to slips being dropped to the administration regarding Roberts extorting, threatening and intimidating visually impaired inmates on 24 company".

46.    Defendant Burkhart conveyed defendant Barlows instructions to defendant Kostyszyn, in which both defendants called inmate Roberts to the gate and communicated defendant Barlows instructions, that he could no longer lock out his cell as porter per their area supervisor Barlow.

47.    Defendant Kostyszyn told Roberts that he was instructed to also search his cell, which Roberts protested, which defendant Kostyszyn declined to search, and instead told Roberts to take the sheets off his bed and make it appeared to have been searched, and informed Roberts that he was aware of what transpired between him and plaintiff last week when we wasn't there.

48.    Inmate Roberts pleaded with both defendants not to lock him in, as porter, stating he was the best porter in the whole block, who waxed and buffed floors and even painted, and could the defendants advocate on his behalf with defendant Barlow in regards to him not locking in as porter, which both defendants agreed that they'll do.

49.    Inmate Roberts immediately proceeded down the tier/housing unit speaking in a loud voice to plaintiffs' neighbor and other inmates that the officers just informed him that he could no longer lock out his cell and function as porter due to several inmates on the housing unit "dropping slips" on him "snitching on him."

50.    Inmate Roberts stated officers said the slips stated he was acting like an "enforcer" for officers, discipline inmates, and "monopolizing" the porter position, and taking advantage of weaker sensorial disable and elderly inmates by extorting them, intimidating and stealing property and having committed an assault against plaintiff the prior week on the company which went unreported.

51.    Inmates Roberts, along with another able-bodied "SRG" safety threat member from the Crips "Rudy Montour" who Roberts had Defendant Barlow and Hall captain Arthur Wall, jr. move from 23, company to 24 company to be with him and have his back, approached another visually impaired inmate retuning from the yard "Kasiem Williams' in an aggressive menacing manner with closed fist.

52.     Inmate Roberts threaten Inmate Williams with bodily harm if he found out Williams was one of the inmate responsible for dropping slips on him having him locked in as porter, and notified Williams that he as well as officers were aware and was not pleased with Williams prior grievances in regards to being assigned porter and not being permitted to work, and not receiving cleaning supplies or water, and stated Defendant Kostyszyn said he would never be a porter.

53.     Inmate Roberts, irritated, agitated and upset at being told he could no longer lock out his cell run around the block and function as porter begun pacing back and forth up and down the tier making general threats towards any inmates responsible for dropping slips on him, which defendant Kostyszyn could hear being within earshot.

54.     After Defendant Barlow return back to the block, inmate Roberts after talking to Defendant officers, came and informed inmates he entrusted Rudy Montour and Robert Moore his two Crips affiliates and others, that defendants informed him that "plaintiff" was one of the inmates responsible for 'dropping slips" on him, which plaintiff neighbor informed him of what Roberts told him.

55.     "Snitching" was a serious offense in prison amongst inmates and especially gang members, in which Defendant officers' disclosure of information about "plaintiff being responsible for the slips being dropped on inmate Roberts causing him to be locked in as porter," caused Roberts to have it in for plaintiff and harbor animosity towards him and disposed to seek revenge against him, which Roberts tried to pay several inmates drugs and money in order to attack plaintiff so that he would be moved and not Roberts, who would have to move not being Sensorial Disable, who wanted to remain porter on the housing unit.

56.     Defendant Officers disclosure of information to Roberts about plaintiff being responsible for the slips being dropped on him, instigated the already grave contemptuous conflict brewing between Roberts, a Dangerous able bodied "SRG" safety threat gang member serving life without parole, and plaintiff a 50 year old vulnerable legally blind multi-disable inmate and subjected him to an imminent threat of serious harm and contributed to him being subsequently brutally assault, which defendants failed to act and/or protect plaintiff and attempted to suppress and cover up by knowingly and intentionally unlawfully filing falsified fabricated disciplinary and incident reports.

57.     Inmate Roberts announced to the inmates in their cells that "Inmates on their tier want to fuck up my bid, by dropping slips on me, snitching on me, having me locked in as porter, I am in turn going to fuck up your lives", which defendant Kostyszyn could hear being within hearing distance.

14

58.     · Inmate Roberts also Stated "Inmates thought they had it bad while he was out as porter, that all he was going to do was have defendant Kostyszyn lock inmate "Rudy Montour" out his cell to function as porter," his Crips gang affiliate who Roberts had moved to 24 co. from 23 co. to be with him, and that "nothing was going to change."

59.     Inmate Roberts Statement of him having inmate Montour locked out his cell to function as porter and nothing was going to change implied that inmates on the company/housing unit would continue to be oppressed, as well as live in reasonable fear for their safety and property, in which inmates were routinely subjected to threats of violence, extortion, thief, assaults, intimidation and an invasion of privacy when inmate Roberts was permitted to lock out of his cell and function as porter on the Sensorial Disable Unit, "SDU." , when he was actually assigned a yard porter job by the program committee.

60.     Defendants Brown, Hodges and Barlow knew, was aware of and/or should have known that mixing "SRG" safety threat members with inmates who were not aligned with a gang and permitting them to lock out of their cells and function as porters caused "insurmountable" problems at Wende, including but not limited to fights, slashes, stabbings, gang wars, friction and violence throughout the prison an disregarded this risk by allowing them to continue to function as porters, and even be assigned porter programs through the program committee.

61.     Defendants Brown, Hodges, Barlow, Kostyszyn and Burkhart were aware, knew or should have known that inmate Roberts and Montour, were Dangerous "SRG" safety threat members from the Crips, and that an affront and/or problem with a fellow gang member will serve as an adequate motivation for other Crips members such as Robert Moore, and/or Rudy Montour to assist Roberts in an offensive violation and/or assault upon plaintiff a person he barely knew and/or never spoken to, which is the nature of a violent gang such as the Crips and their alliance and loyalty to each other.

62.     Defendants Kostyszyn, Burkhart, Jane Doe and other custodial correctional security staff regularly recruited inmates who were "SRG" safety threat gang members as porters to help control and regulate inmates locking on their tier/housing unit to intimidate, keep order, and utilize as enforcers, who dictated what inmates to let out of their cell for the phone, kiosk, shower, amongst other privileges, which the inmate porter gang affiliates received premier preference while non-gang members not aligned with a gang got taken advantage of and left out.

63.     Defendants Kostyszyn, Burkhart and other security custodial staff at Wende were aware and knew and permitted these "SRG" safety threat members they had recruited to steal from inmates,

juggle commissary items 1 for 2, run around the block and have free reign and transport and move contraband i.e. weapons, drugs, stolen property and kites directing illegal gang activity.

64. Defendant Kostyszyn, Burkhart and other security custodial staff at Wende permitted these "SRG" members to punish and/or assault other inmates they disliked, and/or who liked to file grievances and complaints about staff misconduct and/or inmate abuse in order to secure their silence, which also served to insulate these officers from being accountable, and deter other inmates from complaining and perpetuate abuse, and oppression by staff and inmates alike at Wende.

65. Defendant Kostyszyn upon doing his facility count stopped by inmate Rudy Montour cell and asked him whether he wanted to lock out of his cell and be his porter, being as Roberts could no longer function as porter, and recommended Defendant Kostyszyn use Inmate Montour to act in his place, when their were other non-"SRG" inmates available to be porter and had been on the housing unit longer as porter already with porter program assignments.

66. **"SRG"** is a term used to mean "Security Risk Gang" or "Security Risk Group", which is a group of inmates and/or detainees, designated by the Commissioner and Security possessing common characteristics which serve to distinguish them from other inmates and/or detainees or group of inmates or detainees which as a discrete entity poses a threat to the staff, the facility, other inmates, detainees, or the Community, Furthermore, a Security Risk Group safety threat member is "an inmate whose activity, behavior, status as an recognized Security Risk Group Jeopardizes the safety of the public, staff or other inmates and/or the security and order of the facility.

67. Defendants Brown, Hodges, Barlow, Kostyszyn, Jane Doe and Burkhart and the remaining agents and/or employees were aware and knew or should have known that both inmate Roberts and Montour were Dangerous "SRG" safety threat members from the Crips gang, as their "SRG" status, classification, pictures and gang affiliation is well documented with Security, Gang intelligence, in the street and prison, and Central Office in Albany, when based on prior experience, they knew or in the exercise of ordinary care should have known of the Security threat posed by allowing and permitting them to be on the same tier and allowing them to lock out of their cells and function as porters and knowingly and consciously disregarded a known risk to [Prison] safety.

68. All of the above referenced prison authorities Defendants, were aware, knew and/or should have known, or had reason to know about the complaints of abuse and threats from plaintiff and others

to prison administrators and supervisors regarding the altercation between Roberts and plaintiff and consciously failed to act and/or investigate and disregarded a known risk to plaintiff as well as others similarly situated health and safety.

69.     All of the above referenced prison officials Defendants and/or authorities were aware, knew or should have known or had reason to know of the animosity that existed between these "SRG" safety threat members and plaintiff at least a week in advance and even earlier in the day by the slips that were sent to defendants administrators and/or supervisors and Security acknowledging it, however failed to take the appropriate measures to safe guard plaintiff from a foreseeable risk of safety and/or harm.

70.     Upon the count clearing Defendant Kostyszyn opened inmate Montour's cell with the approval of Defendant Barlow his area supervisor to serve the lunch trays, as the entire D-Block was on feed in status due to over 60 or more inmates contracting Covid-19, with specific orders from the Executive team administrations not to permit and/or allow more than one inmate outside of their cell at a time, to prevent the spread of the deadly virus due to administrators failing to quarantine and/or isolate and separate the positive cases, from the negative and instead leaving them amongst inmates not infected in violation of policy and procedure and CDC recommendations.

71.     After inmate Montour finished passing out the food trays, and instead of locking back in his cell per policy and procedure, and facility administrators orders, Defendant Kostyszyn allowed him to stay out his cell and linger on the tier appearing to talk to "7" cell inmate "Robert Moore"# 10-B-3464, another known "SRG" safety threat member from the Crips.

72. Around 12:45pm Defendant Kostyszyn opened up plaintiffs' cell in order for him to utilize the phone and kiosk, which Defendant Kostyszyn stated he would due after the count cleared.

73.     Plaintiff who is a "fall risk" utilizes a "blind mobility cane," and travels with a inmate escort/ sighted guide to help him navigate, and wears a custom fitted knee to foot leg brace due to a drop foot on his left leg came out of his cell with a sweat suit and slippers on. See: Lighthouse Exhibit of plaintiffs' visual acuity.

74. Plaintiff proceeded to the phone and while trying to reach his contacts, inmate Roberts whose cell was right in front and/or across from the  phone and next to the second shower called out to Defendant Kostyszyn to let him out of his cell to shower and use the slop sink.

17

75.     Defendant Kostyszyn got up from the desk and opened up inmates Roberts's cell, which proceeded into the first shower area with a bucket, which had the slop sink and shower.

76.     Inmate Rudy Montour stood by "7" cell appearing to talk to inmate "Robert Moore", the "SRG" safety threat Crips member, who Roberts paid three days prior to throw hot scolding liquid in plaintiffs face, which Roberts paid Moore with "K-2, Synthetic Marijuana", which inmate Roberts was able to obtain such contraband from being permitted to lock out his cell from other inmates within the block acting as porter, being permitted to have free reign within the block, and run around to different tiers unsupervised.

77.     Plaintiff being unable to reach any of his phone contacts tried utilizing the kiosk which immediately locked him out due to hitting the wrong keys.

78. Plaintiff notified Defendant Kostyszyn that he was finished and locking back in, and turned around and proceeded walking back to his cell.

79.     Plaintiff reached around "6" six cell when he was suddenly blindsided, and struck in the head from behind by inmate John Roberts, without provocation, who knocked plaintiff to the ground with great force and violence, who held a metallic instrument in his hand, while plaintiff laid on the ground defenseless, inmate Rudy Montour leaped from (7) cell and began to pouncing on plaintiff with hands and feet, striking plaintiff about the head, face and body, causing plaintiff to have a reasonable fear that would cause imminent peril and screamed out repeatedly for help.

80.     Defendant Kostyszyn, and another unidentified Jane Doe female officer stood outside the gate, and failed to act, and just idly stood standing there observing the vicious brutal attack and assault on plaintiff.

81. Plaintiff laid prone on his back being mercilessly, and brutally assaulted, "yelling for help, screaming out in pain," from the blows, and the Defendant officers stood outside the gate failing to prevent the assault and/or protect plaintiff or issue any verbal warnings and/or activate their body alarms indicting that an altercation and/or incident or fight had suddenly developed, preventing assistance, which was contrary to DOCCS policy and procedure, which all officers do spontaneously and without thought.

82.     Inmate John Roberts, while stomping plaintiff to the ground begun yelling out Gay slurs, calling plaintiff a "Rat Faggot Bastard," while the defendant officers watched from behind the locked gate and did not make any attempt to defuse and/or prevent the attack or even employ any verbal

18

warnings allowing plaintiff to be viciously and maliciously assaulted by these younger aggressive able-bodied dangerous Security Risk Group safety threat members from the Crips, which should have been locked and secured in their cells, and not locked outside their cells and/or permitted to act as porters.

83.     Plaintiff was repeatedly struck, beaten, kicked about the head, face and body until he was rendered unconscious, while defendants stood idly outside the gate observing without taking any steps to protect plaintiff who lay prone on his back on the ground.

84.     Plaintiff regained consciousness, and proceeded to get up off the floor, whereupon defendant Kostyszyn opened the gate and entered, plaintiff picked up his blind mobility cane, and turned and asked defendant Kostyszyn "Why he didn't help him and/or activate his body alarm and received no response."

85.     Plaintiff proceeded to walk back to his cell, with Defendant Kostyszyn following behind, once plaintiff stepped inside his cell to grab a cloth to stop the blood profusely dripping from his left eyebrow, Defendant Kostyszyn closed his gate locking plaintiff in after he was severely wounded.

86.     Around 8 to 10 minutes later, Defendant Barlow appeared in front of plaintiffs' cell laughing, and stated plaintiff should have been bobbing and weaving, and begun taunting plaintiff by shadow boxing until he seen the seriousness of plaintiff injuries.

87.     Defendant Barlow ordered plaintiff to get dress in order to take him to the Regional Medical Unit, "RMU" and got a inmate escort/sighted guide Williams to assist plaintiff to the hospital, who on the way informed plaintiff that inmate Roberts arranged for the assault to occur on him and to have plaintiff family or lawyer get in contact with him to testify as a witness as he was expected to be paroled in January to Buffalo.

88.     As plaintiff was exiting the tier/company inmate John Roberts was on his gate laughing, and blurted out "Yeah, I seen him attack inmate Montour," who was locked in the first shower area with the slop sink as Defendant Barlow escorted us off the unit.

89.     Plaintiff seen a Nurse in the "RMU" who failed to physically examine him, or have him take off his shirt to examine his body for injuries, and only cleaned an laceration over his left eyebrow, and determined that plaintiff needed to be sent to an outside hospital due to suffering an concussion, vomiting, feeling vertigo, and the extensive head and facial trauma he sustained. See: Exhibits "ECMC" reports.

90.    Plaintiff was asked whether he wanted to write a statement, in which he replied "Yes", while in defendant Barlow presence, which was subsequently after the assault and battery committed on him.

91.    Plaintiff wrote "I was jumped and stabbed in the face by inmate Roberts and another "SRG" Crips gang member due to C.O.'s telling Roberts I dropped slips on him and the C.O.'s set me up to be attacked an assaulted and stood idly by and allowed to occur on a legally blind Sensorial Disable Unit, SDU on 24 Co. and wrote on the top of the page. "I WANT TO PRESS CHARGES" See: Exhibit Injury Report.

92.    Plaintiff requested defendant Barlow take pictures of his injuries, which defendant was hesitant to provide, until plaintiff insisted that pictures be taken in front of the "RMU" sergeant who stated "he would do it," only then did defendant Barlow state, "No I will do it," and went and retrieved the camera.

93.    Defendant Barlow took two pictures of plaintiffs head and face, and refused to allow plaintiff to take off his shirt and take pictures of the bruises and marks on his body which is usually done for a fight investigation, or take pictures of plaintiff hands which plaintiff wanted to show the foot prints, bruises and marks he sustained all around his body, and having no bruises and/or marks on his hands which he would have if he had a fight.

94.    At no time did defendant Barlow attempt to ask and/or question plaintiff or interview him in regards to what occurred and/or happened that precipitated the event which resulted in his injuries and/or what even occurred, which is also done in a fight investigation.

95.    Plaintiff requested to be able to speak to Defendant Barlow alone, who dismissed the other officer present and closed the medical treatment room door, in which plaintiff did not want the other officers present to hear what he had to state to Defendant and report back to Defendant officers in D-block, thinking that could confide in Defendant Barlow as the area supervisor, and it being apparent to plaintiff that those defendant officers had a standing agreement to effectuate the assault committed upon him, by the chain of events described above thus far

96.    Plaintiff specifically and thoroughly explained in detail to Defendant Barlow what transpired since they spoke earlier, and/or that defendant Kostyszyn and Burkhart had set him up and arranged for him to be attacked and viciously assaulted by these Dangerous "SRG" safety threat members and failed to act to protect him while being assaulted and just allowed it to occur, and made no attempt whatsoever to protect him

97.    Plaintiff explained how the defendants officers failed to issue and/or employ any verbal warnings or utilize any means and/or procedures to prevent the attack and/or even activate their body alarms which all three defendants wore, which is always routinely and instantly activated without conscious thought or decision when a sudden violent incident develops or occur which would have alerted staff to respond to the incident which is "DOCCS" policy and procedure, whether it's a fight or not cause it could cause serious injuries or even possibly death, or weapons could come out.

98.    Plaintiff explained to Defendant Barlow how the defendant officers had an unobstructive view of plaintiff on the floor on his back screaming out in pain for help while being viciously assaulted, which defendants clearly seen and heard plaintiff cries for help and/or assistance and how they allowed him to be beaten to the ground and informed defendant Barlow he wanted to write a statement and press charges against his assailants and the defendants officers who told inmate John Roberts that plaintiff had "dropped slips on him snitching on him, and arranged for him to be set up and assaulted."

99.    Defendant Barlow informed plaintiff that he could not write a statement, when in fact he could, and instead told him that Defendant would write the statement for him, and stated he ordered defendant officers he  supervised to search inmate John Roberts cell, and ordered him locked in as porter, and wanted to know how Montour and Roberts were outside their cells, when only one inmate was suppose to be permitted outside their cell at a time due to the Covid-19 quarantine lock down of D-block, which was plaintiff.

100.    Defendants Brown, Hodges, and Barlow created a policy and/or custom by which these practices of recruiting "SRG" safety threat members as porters and delegating responsibility for enforcing order to these "SRG" safety threat members, who was allowed to control housing units, phones inside and outside the housing units, oppress, abuse and take advantage of neutral inmates not aligned with a gang or in their particular gang.

101.    At all pertinent times, All Defendants were aware, knew or should have known "SRG" safety threat members were attacking other inmates regularly, stealing property, controlling phones, juggling commissary, intimidating inmates, moving contraband, and inmate-on-inmate violence and victimization, however consciously and negligently disregarded this by failing to correct and/or report accurately, investigate and/or respond to the victim, and took no preventive measures to prevent, and therefore was deliberately indifferent to the rights of inmates.

102. an unsafe and dangerous living environment was permitted to fester on 24 company by placing two or more "SRG" able-bodied dangerous safety threat members of a gang with a propensity for

violence on a tier/housing unit designated for vulnerable LB/SVI inmates in the Sensorial Disable Program, "SDP" subjecting them to conditions of confinement that pose an objective serious risk of harm to their health and safety.

103.    All defendants and "DOCCS" and their officers, agents, assistants and employees individually and collectively were grossly negligent in:

(a) Allowing two or more able-bodied dangerous "SRG" safety threat gang members to lock on a tier and/or housing unit that are designated for vulnerable visually impaired inmates in the "SDP".

(b) Allowing inmates defendants were aware, knew or should have known were particularly dangerous to lock out of their cells unsupervised and function as a porters on a housing unit and/or tier with inmates susceptible to be taken advantage of and/or physically abused, and/or attacked by other prisoners, when based on prior experience they knew or in the exercise of ordinary care should have known: (1) that these practices of permitting "SRG" members with a propensity for violence to lock out of their cells and function as porters on a "Sensorial Disable Unit, "SDU" made it highly foreseeable that some inmates, and in particular plaintiff would be abused, taken advantage of and/or assaulted (2) that these practices posed a serious threat to some of the most vulnerable at risk group of state inmates that is susceptible to physical to abuse, as these inmates need to trust and rely on porters (3) that these practices pose a threat to the general safety and security of the facility. See: PLS Memo to Commissioner and Wende Administrators, about when "SRG" members were allowed to be blind escorts/sighted guides and lock on sensorial disable unit.

104.    In addition, all Defendants, and "DOCCS" and their agents and/or employees were grossly negligent by: (1) being fully aware of a substantial risk of attacks and assaults being committed by "SRG" safety threat members at Wende daily and was longstanding, pervasive, well-documented and/or expressly noted by defendants, which it is a gladiator style on going war by "SRG" safety threat members on each other and inmates in general.

(2)    Were aware, knew or should have known that gang members are often more violent, dangerous, anarchic and manipulative than other inmates, and gang affiliation make them greater Security Risks, which the facility log of unusual incidents of violence and disciplinary office logs the incidents of violence committed by "SRG" safety threat members daily.

105.    "DOCS" security custodial staff, specifically at Attica and Wende Correctional facility permit prisoners to punish other prisoners who are incarcerated for sexual offenses and/or who truthfully complaint of misconduct, and abuses and/or known to file grievances and complaints, and target them

for retaliation, set them up with false disciplinary misconduct, or weapons and assault of staff and/or other conduct which is pattern and practice.

106.    All Defendants, "DOCCS"  and their agents and/or employees tolerance of abuse by security custodial staff of inmates, and failure to adequate investigate, discipline and failure to prosecute inmates who assault other inmates was a "substantial factor" in the continuation of violence by inmates and abuses from staff, and these supervisory Defendants permitted, tolerated, and sanctioned the persistent and widespread policy and practice of abuse and "code of blue" and inmate on inmate assaults and violence by failing to prosecute and/or adequately investigate staff abuse and not wanting to substantiate allegations from prisoners about staff malfeasance.

107.    The failure of the Supervisory Defendants and other Defendants agents and/or employees of "DOCCS" who are responsible for the security and safety of prisoners at Wende to place video surveillance cameras that record on housing unit/tiers like Attica has and to have staff were body cameras like so many other "DOCCS" correctional facilities have implemented for security reasons in order to deter staff inflicting abuses upon inmates and to deter inmate-on-inmate violence and assaults resulted in serious injuries to the plaintiff as well as others similarly situated, which security measures at other facilities have reduced violence amongst inmates and staff abuses, which Wende has the highest rate of staff retaliation, abuses and/or use of forces and inmate on inmate assaults by "SRG" safety threat members to be a relatively small jail, with a smaller population than other facilities with lesser violence and staff abuses.

108.    All Supervisory defendants were grossly negligent which led to the assault and battery on [Plaintiff] by failing to take the appropriate action when the letters were received by supervisors which indicated the dangers plaintiff as well as others similarly situated faced by permitting known Dangerous "SRG" safety threat members to lock out of their cells and function as porters on a "SDU" unsupervised.

109.    All Supervisor Defendants "gross negligence" led to the assault and battery on [Plaintiff]" numerous...security policies and procedures were disregarded and violated, and had defendant, Brown and Hodges been properly supervising Defendant Barlow and Barlow been supervising D-block security custodial staff, these events would have not transpired and plaintiff would have never been injured.

110.    All defendants were grossly negligent and was aware, knew and should have known that "SRG" safety threat members posed a serious threat to visually impaired sensorial disable inmates at

Wende going back as far as 2010, when they were permitted to function as blind escorts/sighted guides and permitted to lock on the same housing unit/tier, with them which prisoners legal services reported "SRG" members were intimidating, extorting, and stealing from them See: Exhibit attached.

111.    All defendants individually and/or through their agents, servants and/or contractors created a danger to plaintiff and/or that rendered plaintiff more vulnerable to the danger and directly participated in failing to take appropriate measures to protect him and failed to remedy the wrongs when  made aware of it, and/or created a policy or custom which allowed the assault to occur and exhibited deliberate indifference to plaintiffs health and safety, and failed to implement safe security policies and procedures for the safe operation of Wende.

112.    Erie Count Medical Center, "ECMC" documented the significant and extensive trauma to plaintiffs face, head and body with contusions, calcifications and bruises all around and on the vortex of plaintiffs head, edema, laceration, shoulder injury, arm and back, which injuries were consistent with being the victim of a gang assault, and not from a altercation in which defendants alleged "only a few punches were exchanged," and "immediately stopped upon a direct order," in their falsified fabricated reports, in an effort to cover up their illegal misconduct and deliberate indifference to plaintiffs health and safety and failure to protect and malfeasance for not intervening or activating their body alarm preventing assistance.

113.    Plaintiff was vomiting and suffered an concussion which was consistent and the result of sustaining violent blows to the head, which caused a temporary lost of function, rendering plaintiff unconscious, and lost total vision in his left eye, which plaintiff could not have sustained from a few punches exchanged which is alleged to have ceased upon command in the fabricated reports, which is defendants explanation and justification for not activating their body alarm preventing assistance in violation of policy and procedure and other applicable laws.

114.    Due to the extensive trauma to plaintiff face, head and body from the brutal assault and battery, while in the E.R. at "ECMC" he ran a temperature of 102, was placed on a I.V. drip of Morphine, which the Doctor performing the surgery in the E.R. notified plaintiff that he could have possibly went into a coma and/or died from the violent blows he sustained to the head at his age and was strong and lucky to be alive, in which plaintiff found out that he had a fractured noise, which came from him being assaulted the prior week by inmate Roberts when he was punched in the noise on or about 12/18/20., which he never had a noise injury.

115.   That by reason of the foregoing, the plaintiff, STEVEN JUDE, was severely injured and damage, rendered sick, sore, lame and disable, sustained severe nervous shock and mental anguish, great physical pain and emotional upset, some of which injuries are permanent in nature and duration, and the plaintiff will be permanently caused to suffer pain, inconvenience and other effects of such injuries; plaintiff incurred and in the future will necessarily incur further hospital and/or medical expenses in an effort to be cured of said injuries; and plaintiff has suffered and in the future will necessarily suffer additional loss of time and earnings from employment; and plaintiff will be unable to pursue the usual duties with the same degree of efficiency as prior to the gross negligence and deliberate indifference of the defendants, all to plaintiffs great damage.

116.   Plaintiff returned from the Hospital to find out that Defendants Kostyszyn, and Barlow knowingly and deliberately acted in concert and conspired to file falsified fabricated disciplinary and incident reports purportedly for misconduct that never occurred or happened in an effort to obscure and conceal the true facts of what occurred to plaintiff and in furtherance of an retaliatory and discriminatory conspiracy of violating plaintiff civil and constitutional rights and to be free from cruel and unusual punishment, and to cover up their illegal misconduct, and malfeasance and prevent plaintiff from exercising his first amendment right to redress the government and press charges.

117.   "DOCCS" and all supervisory defendants and/or agents and employees allowed, tolerated, and/or encouraged security custodial staff to file falsified fabricated reports, make false statements and/or attempt to bolster their stories and encourage a "code of silence" and not be held accountable and/or responsible for their official misconduct, and malfeasance, which is pattern and practice for.

118   Defendants Kostyszyn filed two falsified fabricated disciplinary and incident reports against plaintiff, one for fighting to obscure the facts and provide justification for plaintiffs injuries, and two a weapons charge which defendant allege he found not one but two weapons in plaintiffs cell, which another inmate notified plaintiff upon being release from "SHU that inmate John Roberts threw a metal shank on top of plaintiff bed, right before defendant Kostyszyn allegedly searched, which defendant claimed he found under plaintiff mattress.

119.   Defendant Kostyszyn claimed he found a obsolete inefficient half of toothbrush in plaintiffs locker, which is described in the report as melted to a point, however appeared to have been sharpened with a blade or sharp object, in which nobody utilizes a sharpen toothbrush in prison for a weapon, when inmates have access to metal and can tops to use as weapons and razors.

120.    Mysteriously the metal weapon alleged to have been found is the same weapon that inmate John Roberts possessed and utilized to intimidate inmates with, which was left to Roberts by a inmate name Warren Davis #08-A-4535, who went on a draft to Woodburne correctional facility, and utilized to set plaintiff up to have him removed from the sensorial disable housing and placed in the Special Housing Unit, "SHU" so that Roberts and Montour could stay on the company acting as porter and plaintiff removed.

121.    If plaintiff would have had the knife type weapon that was allegedly found under his mattress in his possession, he would have be able to utilized to defended himself and wouldn't have had a need for an ineffective half of toothbrush, which could not hurt or do any significant damage to nobody and plaintiff could not even hold and/or utilize as a weapon being a half of toothbrush.

122.    Defendant Kostyszyn claimed in another falsified fabricated report that he observed plaintiff a (50) fifty year old legally blind, multi-disable fall risk prisoner who weighs about 165lbs navigates with a blind mobility cane and sighted guide/escort when he travels due to loss of vision from Glaucoma, "attack a (33) year old able-bodied aggressive, dangerous "SRG" inmate who was "6" foot "3", weight 230lbs with closed fist punches, which both Montour and Plaintiff allegedly exchanged punches until defendant gave a direct order to stop, and they complied," which is the "reasons and justification for defendant Kostyszyn not activating his body alarm indicating a altercation had occurred and/or suddenly developed, which is policy and procedure."

123.    Defendant Kostyszyn charged plaintiff with 100.13, fighting, 104.13 violent conduct, and 104.13 creating a disturbance based allegedly on what defendant observed, which was made a serious tier III offense, and based on information and belief, inmate Montour was written a tier II report and made to appear as the victim who as attacked just defending himself from plaintiff.

124.    Upon information and belief inmate Montour has been involved in several incidents of gang violence while in "DOCCS' custody and defendants knew or should have known plaintiff assailant posed danger to other inmates, who was involved with a (11) man mini riot subsequently after the incident with plaintiff with members of the "SRG" blood gang, in D-block and is facing a federal sentence after completing his state sentence for a gang indictment in the Eastern District of New York.

125.    Defendants Kostyszyn claimed he observed plaintiff attack inmate Montour, and was therefore the aggressor, however Montour sustained no injuries whatsoever, did not seek medical attention and plaintiff injuries were rather extensive and could not have occurred from a few punches exchanged,

which immediately ceased upon a direct order, which injuries required hospitalization, in which plaintiff wanted to press charges for.

126.    Defendant Kostyszyn and Barlows falsified fabricated reports are incredible and implausible, and outright lies, which plaintiff could not have possibly received the extensive injuries he sustained to his head, face and body, as described from a few punches exchanged from one inmate, in which plaintiff is also property of the federal government under law and want a federal investigation implemented and charges filed if Defendants insist on lying and opposes this complaint, for unlawfully filing fabricated governmental reports which is a crime and violating plaintiffs civil and constitutional rights, see: . 18 U.S.C. § 1519.

127.    Defendant Barlow claims in his falsified fabricated fight investigation report that plaintiff never told him what the incident was about which is absolutely false, and contradicted by the injury report, and fight investigation which he states plaintiff stated inmate Montour attacked him coming from the phone, plaintiff informed defendant Barlow exactly what occurred, how it occurred and who was responsible, and all this was verbally conveyed, which defendant refused to allow plaintiff to write a written statement.

128.    The objective and thoroughness of defendant Barlows and/or any "DOCCS" employees and/or agent or employees alleged investigation into plaintiffs filed grievances and/or complaints regarding the issues described herein is flawed due to "DOCCS" employees failure to adequately investigate, and/or report accurately and not providing any adverse information about a employee who they insulate from any wrongful misconduct alleged by a prisoner, and practice the 'code of silence" "us against them" motto, which allegations made by a prisoner about staff malfeasance are never substantiated, which is policy and practice.

129.    In addition "DOCCS" supervisors being assigned to investigate officers whom they work and supervise everyday, which would reflect badly on their supervision makes the whole investigation process unreal and illogical, especially if the inmate wants to press charges as plaintiff wanted to in this matter.

130.    All correctional defendants continued to allow inmate John Roberts to lock out his cell and function as porter after the assault on him, and allowed him to steal all plaintiffs personal property, contact information, tablet and leave offensive e-mails to his contacts on J. Pay which he even left his name and numbers of who left the message to plaintiffs daughter who he told in the e-mail that plaintiff was in prison selling his body for drugs and was a homosexual amongst other disrespectful

offensive messages, which was all done during a time plaintiff was outside at the hospital, and is recorded.

131.     On or about 12/13/20 and the 24th Inmate Roberts and another inmate called plaintiff family from his phone contact list with his phone pin registry number and told his family that plaintiff was at the hospital and was assaulted because he was gay and he wrote letters of complaints on inmate Roberts, which the defendant officers showed him the complaints and he recognized plaintiffs handwriting cause plaintiff done legal work for him, which conversation was recorded and plaintiff FOIL.

132.     Defendants continued to allow Inmate Roberts to lock out his cell and act as porter on 24 company who later got into a altercation with another severely visually impaired inmate Simpson, who Roberts fabricated to officers that Simpson tried to stab him, when Roberts had the shank and dropped it, which officers found and did not report and after the alteration defendants moved the severely visually impaired inmate to another block and kept Roberts until the next day after Simpson started complaining that he was legally blind, only then did they move Roberts out and Simpson back, in which Roberts signed into protective custody due to the bloods and  Crips gang wanting to do him bodily harm from Roberts hiding out on the disable unit taking advantage of disable inmates.

133.     Defendant Margaret Strik, failed to act and/or even investigate the complaints plaintiff mailed her and asked her to forward copies to the superintendent and security about being abused, assaulted and/or mistreated by Roberts and others, which her duty as the Mental Health Unit Chief was to implement an investigate and protect plaintiffs health and safety as one of the inmates on the Mental Health case load, which her deliberate indifference to plaintiffs health and safety caused, and resulted in plaintiff being viciously and maliciously assaulted and set up on 12/23/20.

134.     Defendant Deanna Hunt was assigned to hold a Tier III superintendents hearing on plaintiff for two falsified fabricated reports and violated clearly established constitutional due process rights that a reasonable person would have known, and defendant Hunt was never properly trained to conduct and/or preside over a superintendents hearing, defendant Hunt knew or should have known plaintiff was never served with the disciplinary report as per policy and procedure and NYCRR title 7, 254, prior to the commencement of the hearing or he would have signed receipt of it and received an enlarged copy and been provided with an assistant to assist him in defending the report.

135.     Defendant Hunt knew or should have known that plaintiffs hearing was untimely and that the requested extensions to start and finish the hearing was invalid and requested under false pretense, and

violated clearly established due process rights, and defendant Hunt was hostile and bias and refused to present questions plaintiff asked to witnesses, and failed to allow him to introduce exculpatory evidence into the record which would have exonerated plaintiff and challenged the fabricated rendition of the author of the reports, and prejudged plaintiffs guilt.

## VIOALTIONS OF PLAINTIFFS CIVIL RIGHTS
### (Against all Defendants)

136.   Paragraphs 1 through 135 are incorporated as though fully set forth at length.

137.   Acting under color of state law defendants were deliberately indifferent and grossly negligent of their responsibility to plaintiff Steven Jude, while he was in their care, custody and control as federal and state prisoner under the authority of law. This deliberate indifference and gross negligence resulted in violations of the civil and statutory rights of Steven Jude that is guaranteed by the American with Disabilities Act and the 1st, 5th, 8th and 14th Amendments to the Constitution of the United States of America

138.   The defendants failed to separate inmates Roberts and Montour, known dangerous Security Risk Group safety threat gang members of the Crips, from vulnerable legally blind and severely visually impaired prisoners when defendants were aware, knew and/or should have known of their violent and savage propensities, and that such failure would result in acts and threats of physical violence directed at other inmates such as plaintiff Steven Jude

139.   The defendants fail to adequately supervise the actions or inactions of the correction officers at Wende and failed to implement, provide and maintain adequate safe security policies and procedures at the correctional facility, such that plaintiff, Steven Jude as well as others suffered acts and threats of physical violence perpetrated by Inmate Roberts and Montour, from who plaintiff was not reasonable protected in retaliation for filing complaints.

140.   The defendants knowing that Security Risk Group Safety threat members posed a danger to the safety and security of staff, other inmates and the facility, placing vulnerable sensorial disable inmates with visually disabilities on the same housing unit/tier with them, and permitting these "SRG" members to lock out of their cells and function as porters known to be dangerous posed a clear and present danger to the heal and safety of "SDU" prisoners such as plaintiff, and having the power to correct these conditions, willfully, deliberately, maliciously, and with gross negligence and reckless disregards., permitted the assault on Steven Jude to occur. In doing the acts and omissions complained

of, including but not limited to permitting the assault on Steven Jude, the defendants, Brown, Hodges, Strik and others unknown defendants were co-conspirators and intended to deny plaintiff of his constitutional and civil rights protected under the constitution, defendants, in committing such acts are liable to plaintiff under 42 U.S.C.A. §§ 1983, 1985

141.   The inadequate policies and procedures for the safety and security of inmates and actions and practices at Wende at all times relevant to this action, which were due to the acts and omissions of the defendants, violated the plaintiff constitutional rights under the 8th Amendment, which require defendants to take reasonable measures to guarantee the safety and well-being of inmates and grant them the equal protections of the laws, that's guaranteed by the 14th Amendments rendering defendants liable to plaintiff under the constitution under 42 U.S.CA §§ 1983, 1985.

142.   Defendants failed to implement, adopt, incorporate and enforce such rules, regulations, policies and procedures for the safe operation and management of Wende as would reasonably protect plaintiff and others incarcerated from being maliciously and brutally beaten by "SRG" safety threat members with a propensity for violence, which has been longstanding and widespread at Wende, where a gladiator type setting exist amongst "SRG" inmates and assaults and gang violence is rampant, with assaults on inmates occurrences and/or happenings daily throughout the facility.

143.   Defendants, being so situated that any one of them could have acted to prevent the injuries suffered by plaintiff as set forth above, did individually and jointly, deliberately, maliciously and willfully failed to do so, rendering defendants liable to plaintiff under 42 U.S.C.A. §§ 1983, 1985

144. By reason of the above unlawful, malicious and deliberate acts, actions, conspiracies and course of conduct of, by and among defendants, plaintiff has been damaged in an amount in excess of $3000,000,00, including actual physical injuries, unlawful depravation in solitary confinement, "SHU" violation of plaintiffs civil rights, pain and suffering, loss of the use of the vision in his left eye, and limited use of his left arm due to permanent damage to his left shoulder

<div align="center">

DISCRIMINATION
(ALL DEFENDANTS)

</div>

145.   Paragraphs 1 through 145 are incorporated as though fully set forth here at length.

146. The aforesaid acts by all defendants, were under taken as part of a policies and practice of "DCCS" and its employees, agents and/or servants to discriminate against Sensorial Disable inmates being held in their care, custody an d control

147.    During the course of plaintiffs incarceration, defendants created and allowed to exist a hostile living environment based on disability discrimination at Wende, and discriminate against and showed deliberate indifference to plaintiff as well as others similarly situated health and safety, such discrimination was in violation of the American with Disabilities and Rehabilitation Act statue 28 C.F.R 35.134 (a) (b) and other applicable laws that embodies the constitution.

148. Defendants discriminated against and showed deliberate indifference to plaintiffs health and safety by retaliating against him for filing grievances and complaints about his unlawful discrimination and denials of his reasonable accommodations and assistive devices and services needed for his disability, and unsafe living conditions on a disability housing unit and was defendants was grossly negligent in supervising subordinates who committed wrongful acts and allowed the continuance of such a policy or custom of denying appropriate reasonable accommodations and safe living conditions for "DOCCS" sensorial disable population.

<div align="center">NEGLIGENCE</div>

149.    Paragraphs 1 through 149 are incorporated as though fully set forth here at length.

150.    That this action falls within one or more of the exceptions set forth in CPLR 1602.

151.    Pursuant to CPLR, 1602 (2)(iv) defendants are jointly and severely liable for all of plaintiff damages, including but not limited to plaintiffs non-economic loss, irrespective of provisions of CPLR section 1601, by reason of the fact that defendants wrongful conduct was intentional

152.    Pursuant to CPLR, 1602 (2)(iv) defendants are jointly and severely liable for all of plaintiff damages, including but not limited to plaintiffs non-economic loss, irrespective of provisions of CPLR section 1601, by reason of the fact that defendants are vicariously liable for the negligent acts and omissions of those caused or contributed to the plaintiffs injuries.

153.    Pursuant to CPLR, 1602 (5) defendants are jointly and severely liable for all of plaintiff damages, including but not limited to plaintiffs non-economic loss, irrespective of provisions of CPLR section 1601, by reason of the fact that defendants owed the plaintiff a non-delegable duty of care.

154.    Pursuant to CPLR, defendants are jointly and severely liable for all of plaintiff damages, including but not limited to plaintiffs non-economic loss, irrespective of provisions of CPLR section 1601, by reason of the fact that defendants wrongful conduct was intentional.

155.    Pursuant to CPLR, 1602 (2)(iv) defendants are jointly and severely liable for all of plaintiff damages, including but not limited to plaintiffs non-economic loss, irrespective of provisions of CPLR section 1601, by reason of the fact that defendants acted with reckless disregard of the safety of others.

156.    Pursuant to CPLR, 1602 (2)(iv) defendants are jointly and severely liable for all of plaintiff damages, including but not limited to plaintiffs non-economic loss, irrespective of provisions of CPLR section 1601, by reason of the fact that defendants acted knowingly or intentionally, and in concert, to cause the acts or failures which are a proximate cause of plaintiff's injuries.

157.    The foregoing injuries and damages to the plaintiff were caused solely by virtue of the carelessness, negligence, breach of duty, failure to protect and deliberate indifference and reckless disregard by defendants for plaintiff's safety, and without any negligence on the part of plaintiff.

158.    The described negligence of the defendants was tantamount to gross and/or wanton negligence, entitling plaintiff to punitive damages.

159.    Defendants owed a duty to incarcerate the plaintiff with due care, and defendants breached such duty, by not guarding plaintiff against violence from other inmates and increasing the danger.

160.    All defendants had actual and constructive notice that the safety, life and health of the plaintiff was threatened, endangered, by reasons of the facts set forth above and failed to act.

161.    All defendants negligently, carelessly, recklessly failed to implement policies and procedures for the safety and security of inmates which including but not limited to video surveillance on housing units, body cameras on officers, policies and procedures directing "SRG" safety threat members from being assigned to lock on disable housing unit, and prohibited from being assigned porter programs and locking out as porters and sighted guides/escorts for the blind to protect the safety and security of inmates and the facility and prevent harmful illegal contact and assaults and misconduct from staff, which is longstanding and widespread at Wende.

162.    All Defendants maintained exclusive control over inmates in their care, custody and control, including plaintiff STEVEN JUDE, and his assailants Rudy Montour and John Roberts.

163.    All defendants was exclusively responsible for the safety of plaintiff, STEVEN JUDE who was in tier care, custody and control and permitted plaintiff to be assaulted and robbed by fellow inmates of all of his possessions

164.    Prior to 12/23/20, the named defendants, agents and/or employees had constructive knowledge of inmate Rudy Montour and John Roberts gang membership and affiliation and history of their tortuous, unlawful, wrongful and violent and/or anti social behavior.

165.    On or about 12/23/20 all of the named defendants, agents and/or employee had made reasonable inquiry, they would have discovered the history of tortuous, unlawful, wrongful, violent and/or anti-social behavior if inmate Montour and Roberts, as well as the ongoing danger and threat

they posed to plaintiff, STEVEN JUDE, especially in light of him as well as others writing letters to the administrators at Wende of the threats and dangers to him as well as others similarly situated faced from "SRG" safety threat members from the Crips locking on the sensorial disable unit and being permitted to lock out of their cells and function as porters

166.    In view of the above, the respective defendants, agents and/or employees of "DOCCS" acted with reckless and gross negligence in failing to adequately protect plaintiff from the threat and ultimate physical violence posed by members of the "SRG" Crips gang, and more specifically that violence which was perpetrated by inmates Montour and Roberts pursuant to the orders and directions of Defendants Kostyszyn, and Burkhart.

167.    Due to the defendants negligence, plaintiff, TEVEN JUDE, was violently beaten and physically injured through no fault of his own, and is entitled to damages in the sum of $300,000,00

<div align="center">RETALIATION</div>

168.    Paragraphs 1 through 167 are incorporated as though fully set forth here at length

169.    Plaintiff assault and battery was in retaliation for his protected speech about staff misconduct and abuse/mistreatment from inmates, which staff allowed to occur and turn a blind eye too, and failed to report.

170.    Plaintiff has a constitutional protected right to submit grievances and complaints and redress the government and be provided with reasonable safe living conditions of confinement, and in retaliation for those grievances and complaints, defendants "DOCCS" employees, agents and/or servants took tangible adverse action against plaintiff by arranging, allowing and permitting him to be viciously and maliciously assaulted, failed to act to protect plaintiff and/or intervene and falsified reports in furtherance of the conspiracy to obscure and conceal the true facts of the illegal misconduct and malfeasance by defendants custodial security staff.

171.    A legitimate, nondiscriminatory and/or non-retaliatory reason does not exist to justify none of the defendants' actions which were intentional, disparate and retaliatory treatment of plaintiff, which was outrageous, which practices constituting a violation of plaintiffs' constitutional rights.

172. The unlawful retaliatory practices that's complained of and the actions of defendants and/or their agents were willful, wonton, intentional and committed with malice or with reckless indifference to plaintiffs protected rights, entitling him to compensatory damages and punitive damages pursuant to 1983, 1985 to punish defendants for their actions and to deter them, and others, from such actions in the future.

173.    As a direct, proximate and foreseeable result of defendants actions plaintiff has suffered emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, loss of dignity, emotional distress, and humiliation and other nonpecuniary losses and intangible injuries.

174.    Defendants violated plaintiffs rights under the United States constitution guaranteed by the 1st Amendment to redress the government by retaliating against plaintiff for filing grievances and complaints, Defendants in committing such acts are liable to plaintiff under 42 U.S.C.A §§ 1983, 1985.

## CONSPRIRACY
### (Against all Defendants)

175.    Paragraphs 1 through 174 are incorporated as though fully set forth at length.

176.    Defendants, and each and every one of them, agreed and/or combined to engage in a civil conspiracy to commit the unlawful acts as described above for their own interest and to violate plaintiffs civil rights by arranging and permitting him to be viciously assaulted in retaliation for filing grievances and complaints, and falsified reports to conceal and obscure the true facts, as described above in violation of 42 U.S.C.A. §§ 1983, 1985 for which the defendants are individually liable.

177.    In committing the acts described above, defendants acted with malice towards plaintiff, and plaintiff is entitled to recover punitive and exemplary damages in the sum of $300,000,00 in such as will sufficiently punish defendants for their willful and malicious conduct and as will serve as an example to prevent a repetition of such conduct in the future.

## MALICIOUS ABUSE OF PROCESS, FALSE MISCONDUCT, FABRICATED REPORTS, DUE PROCESS

178.    Paragraphs 1 through 177 are incorporated a though fully set forth here at length.

179.    Defendants Kostyszyn and Barlow used disciplinary measures and process against plaintiff by failing falsified reports of false and fabricated misconduct in order to intimate plaintiff and to dissuade and deter him from asserting his protected rights an din order to cover up their own wrong doing and malfeasance, and avoid civil and criminal liability for their own acts.

180.    Defendants Kostyszyn and Barlow knowingly and intentionally falsely accused plaintiff for misconduct and subjected him to solitary confinement in Special Housing Unit, "SHU" and allowing all his personal property to be stolen, causing plaintiff to suffer damages.

181.   The acts of defendants Kostyszyn, Burkhart and Barlow were done in bad faith, and maliciously with the intent to deter plaintiff from exercising plaintiffs constitutional rights to redress the government and to an fair and impartial hearing and to pursue charges and caused him to suffer intentional infliction of emotional injuries, and such acts warrant the imposition of punitive damages.

182.   Defendant Hunt violated clearly established Constitutional Due process rights of the plaintiff which she knew or should have known she was violating and her motto is "ALL PRISONERS ARE GUILTY OF MISCONDUCT CHARGES FILED BY STAFF" and she has a 100% conviction rate of disciplinary charges sustained against prisoners overseeing the tier three disciplinary hearings, and her intent was to cause plaintiff intentional infliction of emotional trauma by unlawfully placing him in solitary confinement and be denied of his reasonable accommodations for his disability.

### (VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT)
### (ALL DEFENDANTS)

183.   Paragraphs 1 through 182 are incorporated as though fully set forth at length.

184.   Plaintiff is a qualified individual with a disability as defined in the ADA. He is legally blind and has a drop foot, which substantially limits the major life activities of seeing and walking, it also affects other major life activities including reading, learning, performing manual tasks, walking, communicating and working.

185.   Plaintiff has records of having such impairment.

186.   As a State prisoner, plaintiff meets the essential eligibility requirement for the receipt of services and/or participation in programs, services or activities provided by defendants and to file grievance and complaints about unlawful discrimination and unsafe living conditions of confinement 42 U.S.C. § 12102 (2): 42 U.S.C. § 12131 (2) U.S.C. § 794, 28 C.F.R. 35.134 (a) (b); 28 C.F.R. § 35.130 and other applicable laws that embodies the constitution.

187.   Defendants discriminate against legally blind prisoners by failing to accommodate their disabilities and retailing against them for filing grievances and complaints about being denied appropriate reasonable accommodations for their disability in order to be able to access the programs, and services in at least the following areas; educational, vocational, work, grievance, disciplinary proceedings, Health Services, recreation and safe disability housing.

188.   Defendants discriminate against plaintiff on the basis of his disability in violation of 42 U.S.C. § 12132.

189.   Defendants are agents, officials and/or employees of a public entity and/or public entity as that term is defined under 42 U.S.C. §12131(1)(B).

(

### (VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT)
### (ALL DEFENDANTS)

190.   Paragraphs 1 through 189 are incorporated as though fully set forth at length.

191.   Plaintiff is a qualified individual with a disability as defined in the ADA. He is legally blind and has a drop foot, which substantially limits the major life activities of seeing and walking, it also affects other major life activities including reading, learning, performing manual tasks, walking, communicating and working.

192.   Plaintiff has records of having such impairment.

193.   As a State prisoner, plaintiff meets the essential eligibility requirement for the receipt of services and/or participation in programs, services or activities provided by defendants and to file grievance and complaints about unlawful discrimination and unsafe living conditions of confinement 42 U.S.C. § 12102 (2): 42 U.S.C. § 12102 (2); 42 U.S.C. § 12131 (2). C.F.R. 35.134 (a) (b); 28 C.F.R. § 35.130.

194.   Defendants discriminate against legally blind prisoners by failing to accommodate their disabilities and retailing against them for filing grievances and complaints, during the course of plaintiffs incarceration, defendants crated and allowed to exist a hostile living environment based on disability discrimination at Sullivan, Eastern and Wende, and discriminated against and showed deliberate indifference to plaintiff as well as others similarly situated Health and safety and disabilities needs, such discrimination was in violation of the American with Disabilities Act and Rehabilitation act statutes 28 C.F.R 35.134 (a) (b); 28 C.F.R. § 35.130, and other applicable laws that embodies the constitution.

195.   Defendants discriminate against plaintiff solely on the basis of his disability and retaliated against him in violation of the disabilities statues for filing grievances and complaints.

196.   DOCCS receives federal financial assistance.

PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court enter a judgment against defendants, and each of them, jointly and severely as follows:

197.   Adjudging and declaring that the policies, practices, omissions, and conditions described above are in violation of the rights of plaintiff under the Constitution and State law.

198.   Directing defendants to immediately transfer plaintiff from Wende as they have put his life and safety in jeopardy by gang members and other inmates by telling them plaintiff was pressing charges against his assailants, and suing the officers who is known to retaliate.

199.   Directing defendants by enjoining and restraining them from continuing to allow Security Risk Group, "SRG" members from being assigned to be house on the designated Disability housing unit and being assigned porter and escort for the blind jobs and programs, and/or permitted to lock outside of their cell as porters.

200.   Directing defendants to expunge all references of the falsified fabricated disciplinary charges and misconduct from plaintiff records and files and restore his $5.00 disciplinary fee.

201.   Directing defendants to take all necessary steps to immediately install video surveillance cameras on all housing unit/tiers and require all security custodial staff to wear body cameras for the safety and security of the facility and inmates and to deter staff abuse and assaults on inmates.

202.   Directing defendants to provide plaintiff with a portable CCTV on loan in order to be able to read at all times in his cell, and a type writer on loan for cell use as an reasonable accommodation for his disability, assistive devices and services, which would permit him to read and effectively communicate in accordance to the Disability statues.

203.   Permanently enjoining defendants and all persons acting in concert with them from subjecting plaintiff to retaliation, and unsafe conditions of confinement that pose a risk of serious harm to his health and safety.

204.   Awarding plaintiff reasonable attorney fees, costs, disbursements, and other litigation expenses pursuant to 42 U.S.C. § 1988.

205.   Punitive damages.

206. Such other and further relief as the court deems just and proper.

Dated: April 1, 2021

*Steven Jude*

## **VERIFICATION**

I STEVEN JUDE, being duly sworn deposes and says that I am the above captioned plaintiff in the within 1983 U.S.C. Complaint and that I have read the foregoing Complaint and knows the contents thereof, that the same is true to his knowledge, expect as to the matters therein state to be alleged on information and belief and that as to those matters, he believes them to be true.

Steven Jude, pro-se

Subscribed and sworn to before me

This ___13___ day of ___May___, 2021

NOTARY PUBLIC

Charlene C. Hulett
Notary Public, State of New York
No. 01HU4391978
Qualified in Erie County
My commission expires May 20, 2023

DATED: March 31, 2021

2

Opt 4.2012

# LIGHTHOUSE
### INTERNATIONAL

New York Lighthouse
Vision Rehabilitation Service

August 20, 2008

Re: Steven Jude          10A4771
      DOB: 03/22/1970

To Whom It May Concern,

Please be advised that Mr. Steven Jude is a patient of Lighthouse International. At his last visit on 08/20/08, best corrected VA was found to be 1 foot/300 (20/6000) OD, and HM OS, thereby rendering Mr. Jude Legally Blind from Glaucoma OD, OS. Due to his extremely impaired vision, climbing steps, seeing traffic lights, crossing streets, seeing street signs and reading are all extremely difficult tasks. Mr. Jude is at great risk for injury should he need to use mass transit without the assistance of a sighted guide. Please assist this nice gentleman in any way possible. If you have any questions, please feel free to contact me.

Sincerely,

Andrea Zimmerman

Andrea Zimmerman, OD FAAO
Lighthouse International Low Vision Clinician

111 East 59th Street New York, NY 10022-1202
Tel: (212) 821-9200 Fax: (212) 821-9707 TTY: (212) 821-9713 www.lighthouse.org

 **Commission for the Blind**

**ANDREW M. CUOMO**
Governor

**SHEILA J. POOLE**
Acting Commissioner

## Verification of Legal Blindness

| | |
|---|---|
| Name:<br>STEVEN JUDE #72469-054 | NYSCB Registration No.<br>CF# 162955 |
| Address:<br>M.C.C. 150 Park Row<br>New York, NY 10007 | |

The above named person is registered as legally blind with the Commission for the Blind in accordance with New York State law, Section 8704.

Signature: _Ryr T-Gm_

Title:   Director, Program Evaluation and Support
Date:    08/19/2015

MR# M001363931        Account # V00006227797        Report# 1223-1082

Please see the dedicated CT of the chest, abdomen and pelvis for findings outside of the spine.

CHEST:
Neck base: Normal.
Lungs and large airways: There is dependent atelectasis within the bilateral lower lobes. Large airways are unremarkable.
Pleura: No effusion or pneumothorax.
Heart and pericardium: Heart size is normal. No pericardial effusion.
Mediastinum and hila: Unremarkable. There is no pathologic adenopathy.
Vessels: Normal.
Bones and soft tissues: No acute osseous abnormality.

ABDOMEN AND PELVIS:

Liver: There is a faintly enhancing 1 cm focus within the lateral left hepatic lobe on the arterial and portal venous phases that most likely represents a flash filling hemangioma.
Gallbladder and biliary tree: No calcified gallstones. Normal caliber wall. No intra- or extrahepatic biliary ductal dilation.
Pancreas: Normal.
Spleen: Normal.
Adrenals: Normal.
Kidneys and ureters: No suspicious renal lesion. No hydronephrosis or calculi.
Bladder: Normal.
Visualized Reproductive Organs:  Unremarkable.
GI Tract:esentery and Peritoneal Cavity: There is no bowel wall thickening or dilatation. No free air or free fluid.
Retroperitoneum: Unremarkable.
Lymph nodes: No lymphadenopathy.
Vessels: Unremarkable.
Bones and soft tissues: There is a 2.6 cm ill-defined focus of nonenhancing soft tissue thickening within the right anterior hemipelvis, interposed between the right inguinal canal, right external iliac vasculature, and bladder, best seen on series 501 image 141. No acute osseous abnormality.

IMPRESSION:
1. Ill-defined 2.6 cm nonenhancing soft tissue focus interposed between the right inguinal canal, right external iliac vasculature, and bladder. This is of indeterminate etiology and may represent a small contusion, sequelae of prior surgery, or from attempted line placement. Correlate with clinical history and physical exam findings.
2. There is otherwise no evidence of acute traumatic abnormality within the chest, abdomen, and pelvis.

## Medical Decision Making
**Medical Decision Making**
50-year-old male presents emergency department today from his correctional facility after he was assaulted by other inmates having been stabbed with a shank above his left eye, struck in the head, and hit all over his body.  He did lose consciousness.  He is currently complaining of head pain, back pain, and left upper extremity pain.  He has had episodes of nausea and emesis.  On initial arrival to the emergency department the patient is hemodynamically stable with a GCS of of 14.  He is able to localize his pain.  On examination there is a 2 cm laceration above the left upper lid without any evidence of injury to the globe or hyphema.  Lungs are clear to auscultation and chest wall is nontender.  Abdomen is soft with diffuse tenderness to palpation.  Vertebrae are with diffuse tenderness to the thoracic spine without any obvious deformity or injury.  There is no neurologic deficit.  We will proceed forward with ordering CT imaging of the head, face, torso, and spine.  Will also obtain x-ray imaging of the left upper extremity.

1940: The patient's work-up has returned unremarkable for acute findings.  Patient did become febrile with a temperature of 102.2F, he denies any complaints of infection and this is likely reactive to the trauma.  He will be given a dose of Tylenol for this.  CT of the head shows a subgaleal hematoma without any intracranial injury, hemorrhage, or skull fracture.  CT of the spine does not show any fracture or dislocation.  CT of the torso reveals a questionable area which is possibly a small hematoma in the right inguinal region, the patient states that he has had surgery in this region in the past and he is nontender on physical exam without any overlying skin changes.  X-ray imaging of the upper extremity is negative for fracture or dislocation.  Laceration was able to be repaired at bedside without issue.  Cervical collar was removed.  The patient can be discharged to Wende CF and be placed in the infirmary to be monitored for his concussion.

## ED Diagnoses
**Diagnoses**
Diagnoses:
        **Primary Impression:**

12/24/20  18:34:50  718/346001                          26for_Erie County he  Page 003

MR# M001363931      Account # V00006227797        Report# 1223-1082

## ERIE COUNTY MEDICAL CENTER CORPORATION
### ED-Provider Report
462 Grider St.,Buffalo, NY 14215
(716) 898-3000

**Patient's Name** JUDE,STEVEN                    **MR#:** M001363931/**Account #:** V00006227797
**Report#** 1223-1082                              **Age/Sex:** 50/M
**Date of Birth:** 03/22/1970                      **Admission Date/Time:**
**Attending Physician:**                           **Admitting Service:**
**Dictating Provider:** THOMPSON,SARAH PA-C        **Dictating Date/Time:** 12/23/20 1650
**Primary Provider:** WENDE CORRECTIONAL,FACILITY

## History of Present Illness
### General
**Tracker Chief Complaint:** Body Wide Pain
**Time seen by ED provider:** 16:46
**Source:** patient
**History Limitations:** no limitations

### Allergies/Medications
**Allergies:**
**Coded Allergies:**
   No Known Allergies (Unverified , 12/23/20)

## History of Present Illness
### Initial Comments
50-year-old male with a past medical history of glaucoma, legal blindness, asthma, diabetes , hypertension, history of polysubstance abuse, and antisocial personality disorder who is currently an inmate at Wende correctional facility who presents to the ER today after he was assaulted. The patient states that earlier today. The patient states that he was stabbed with a shank just above his left eye by 2 gang members at his facility, he was then struck in the head with closed fists and all over the body. He did lose consciousness. He is currently experiencing pain to his left eye, headache, back pain, and left arm pain. He states that he is nauseous and has had a few episodes of vomiting. He states that he has having some vision changes secondary to swelling of his eye but is legally blind at baseline. He does not take blood thinner medications. He is not sure when his last tetanus shot was. He denies any numbness or weakness of his extremities.

## Past History
### Past History
**Past Medical History:** Reports other (as stated in HPI)
**Surgical History:** Reports no surgical history

### Social History
**Living Arrangements:** other (DOCCS WENDE)
**Smoking:** smoker
**Alcohol:** denies
**Substance Use:** Reports none

## Review of Systems
### Review of Systems
**ROS Narrative**
Review of Systems

General: Denies fever, chills, malaise, fatigue, sweats
Eye: Admits to eye pain and vision changes
HENT: Admits to tinnitus denies nasal discharge, sore throat, otalgia
Respiratory: Denies cough, shortness of breath, stridor

ERIE COUNTY MEDICAL CENTER
HEALTHCARE NETWORK

462 Grider Street                                                    Buffalo, New York 14215

DEPARTMENT OF IMAGING SERVICES


PT NAME: JUDE,STEVEN                         Pt Type: REG ER    Pt Location: ER
MRN: M001363931                              Attending:
DOB: 03/22/1970    Sex: M                    Referring: THOMPSON, SARAH PA-C
Service Date: 12/23/20 Time: 1655           Primary Care: WENDE CORRECTIONAL,FACILITY
Requisition No: 20-0141254                  Account Number: V00006227797
Procedures:                                 REPORT NO: 1223-0335
1223-0088 CT/CT Head Trauma WO IV
1223-0089 CT/CT Face Trauma WO IV


CT Head Trauma WO IV, CT Face Trauma WO IV

CLINICAL HISTORY: INJURY

PROCEDURE: CT images through the head and face were acquired without IV contrast.  Up-to-date CT
equipment and radiation dose reduction techniques were employed. CTDIvol: 49.2 mGy, DLP: 1406
mGy-cm  (accession CT20201223-0088), Up-to-date CT equipment and radiation dose reduction
techniques were employed. CTDIvol: 0 mGy, DLP: 0 mGy-cm  (accession CT20201223-0089)

STUDY COMPARISON: No prior studies were available for comparison.

FINDINGS:

CT HEAD:

Small right parietal subgaleal hematoma near the vertex. Multiple scalp calcifications are present.

There is no evidence of an acute large territorial infarction, intracranial hemorrhage, mass or mass effect,
or abnormal extra-axial collection.

There is no abnormal brain parenchymal density.

The ventricles, sulci and cisterns are normal in size and configuration. There is no hydrocephalus.

The density of the larger dural venous sinuses is normal.

The skull base and calvarium are normal.

The included paranasal sinuses are predominantly clear.

The included mastoid air cells are predominantly clear.


CT FACE:

Left periorbital preseptal soft tissue swelling.

There is an age indeterminant left nasal bone fracture.

The parotid and submandibular glands are within normal limits.

Adenoids are prominent for a patient this age.

12/24/20  18:35:57  From:6001                           Zeror_Erie County He Page 007

MR# M001363931        Account # V00006227797        Report# 1223-1082

Left humerus: No acute fracture or dislocation.
CT.

**CT HEAD:**

**Small right parietal subgaleal hematoma near the vertex.** Multiple scalp calcifications are present.
There is no evidence of an acute large territorial infarction, intracranial hemorrhage, mass or mass effect, or abnormal extra-axial collection.
There is no abnormal brain parenchymal density.
The ventricles, sulci and cisterns are normal in size and configuration. There is no hydrocephalus.
The density of the larger dural venous sinuses is normal.
The skull base and calvarium are normal.
The included paranasal sinuses are predominantly clear.
The included mastoid air cells are predominantly clear.

**CT FACE:**

Left periorbital preseptal soft tissue swelling.
There is an age indeterminant left nasal bone fracture.
The parotid and submandibular glands are within normal limits.
Adenoids are prominent for a patient this age.
The course and caliber of the optic nerve sheath complex is within normal limits
The extrocular muscles, intraconal fat, and extraconal fat are within normal limits.
The bony orbital walls and optic canals are normal.
The lacrimal glands appear normal.
The visualized paranasal sinuses and tympanomastoid cavities are unopacified.

IMPRESSION:
1.  No acute intracranial abnormality.
2.  Age indeterminant left nasal bone fracture. Correlate for point tenderness.
3.  The adenoids are prominent for a patient this age which is most commonly reactive or secondary to an immunocompromised state.

**CT SPINE:**

FINDINGS:

Cervical spine:
There is no evidence of an acute fracture or subluxation. Normal alignment is maintained without scoliosis or listhesis.
Vertebral body heights are maintained.
No aggressive osseous lesions are identified.
There are mild multilevel spondylotic changes of the cervical spine with multiple levels of mild spinal canal narrowing.
The paraspinal soft tissues are unremarkable.

Thoracic spine:
There is no evidence of an acute fracture or subluxation. Normal alignment is maintained without listhesis.
Vertebral body heights are maintained.
No aggressive osseous lesions are identified.
There are mild multilevel spondylotic changes without areas of significant spinal canal narrowing.
The paraspinal soft tissues are unremarkable.

Lumbar spine:
There is no evidence of an acute fracture or subluxation. Normal alignment is maintained without listhesis.
Vertebral body heights are maintained.
No aggressive osseous lesions are identified.
There are mild spondylotic changes at the L4-L5 level without significant spinal canal narrowing.
The paraspinal soft tissues are unremarkable.

IMPRESSION:
1.  No acute fracture in the cervical, thoracic or lumbar spine.

Cardiovascular: Denies chest pain, edema, dizziness
Gastrointestinal: Admits to abdominal pain, nausea, vomiting. Denies stool changes
Genitourinary: Denies urinary frequency, dysuria, hematuria
Musculoskeletal: Admits to muscle aches, arthralgias
Skin: Admits to bruising
Neurologic: Admits to headache. Denies numbness, seizure activity, difficulty ambulating
Immunologic: Denies allergies, anaphylaxis history
Psychiatric: Denies SI/HI

## Physical Exam
### Vital Signs
**Vital Signs**

**Vital Signs**

| Date Time | Temp | Pulse | Resp | B/P (MAP) | Pulse Ox | O2 Delivery | O2 Flow Rate | FiO2 |
|---|---|---|---|---|---|---|---|---|
| 12/23/20 18:36 | 102.2 | | | | | | | |
| 12/23/20 18:21 | | 107 | 16 | 137/77 | 98 | | | |

### Physical Exam
**General Appearance:** other (Patient is lethargic on exam, sleeping in the examination room. Does recover lab stimulus to awake)
**Eye:** PERRL, EOMI, other (There is an approximately 2 cm laceration just above the left upper lid with significant edema about the periorbital region. With manual opening of the lid there is no evidence of hyphema or pupillary defect)
**ENT:** nasal-turbinates (No evidence of epistaxis), lips, teeth, gums inspection (No dental injury), oral-mucous membranes moist, hematoma (There is a large hematoma to the left occiput as well as bruising noted to the right occiput)
**Neck:** normal range of motion, other (There is tenderness to palpation to the entire posterior neck)
**Respiratory:** normal breath sounds, no respiratory distress, chest non-tender, lungs clear, normal respiratory effort
**Cardiovascular:** regular rate, rhythm, no edema, normal peripheral pulses
**Abdominal/Gastrointestinal:** normal bowel sounds, soft, tenderness (Diffuse tenderness to palpation)
**Back:** normal inspection, other (No obvious deformity or injury. There is point tenderness over the entire thoracic vertebrae and upper lumbar vertebrae without step-off deformity or obvious injury)
**Extremities:** other (Patient maintains full range of motion of his lower extremities and is without any point tenderness. Normal range of motion of the lower extremities without any deficit. No point tenderness about the right upper extremity and he maintains full range of motion. There is some point tenderness to the humerus of the left upper extremity with limited range of motion of the shoulder secondary to pain)
**Skin:** no rashes, no nodules, warm/dry
**Psychiatric:** alert & oriented x3, normal thought pattern
**Neurologic:** normal speech, cranial nerves intact, motor strength normal, sensory normal

## Procedures
### C-Spine Clearance
**Mechanism:** Fall
**Collar placed:** Hospital
**Patient Reliable:** No
**If no, Reason why:** Altered mental status (GCS<15)
**Patient complaints:** Neck pain-specify location (diffuse neck pain)
**CT scan:** Normal
**Clear of sig injury based on:** Normal imaging of full c-spine
**Plan:** Collar removed

### Laceration/Wound Repair
**Location:** face
**Wound Length (cm):** 2
**Depth, Shape:** linear
**Wound Explored:** clean
**Irrigated w/ Saline (ccs):** 20
**Betadine Prep?:** Yes
**Anesthesia:** 1% Lidocaine w/ Epi
**Volume Anesthetic (ml):** 5

PT NAME: JUDE,STEVEN
DEPARTMENT OF IMAGING SERVICES

MEDICAL RECORD NUMBER: M001383931
REPORT NO: 1223-0335

The course and caliber of the optic nerve sheath complex is within normal limits

The extraocular muscles, intraconal fat, and extraconal fat are within normal limits.

The bony orbital walls and optic canals are normal.

The lacrimal glands appear normal.

The visualized paranasal sinuses and tympanomastoid cavities are unopacified.

IMPRESSION:

1. No acute intracranial abnormality.

2. Age indeterminant left nasal bone fracture. Correlate for point tenderness.

3. The adenoids are prominent for a patient this age which is most commonly reactive or secondary to an immunocompromised state.

Films reviewed and dictated by:    DOUGLAS S DRUMSTA MD  12/23/20 1821
Signed by:                                        <Electronically signed by DOUGLAS S DRUMSTA MD in OV>
Sign date / time:                             12/23/20 1828

12/23/20 1821 XXX

Copies To: WENDE CORRECTIONAL FACILITY;
  Printed:

FORM 2171A (10/14)   STATE OF NEW YORK – DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
Side 1

_Wende_ Correctional Facility

## INMATE MISBEHAVIOR REPORT ♦ INFORME DE MAL COMPORTAMIENTO DEL RECLUSO

| 1. NAME OF INMATE (Last, First) ♦ NOMBRE DEL RECLUSO (Apellido, Nombre) | NO. ♦ NÚM. | HOUSING LOCATION ♦ CELDA |
|---|---|---|
| Jude, S | 17A0890 | 24-11 |
| 2. LOCATION OF INCIDENT ♦ LUGAR DEL INCIDENTE | INCIDENT DATE ♦ FECHA | INCIDENT TIME ♦ HORA |
| D-Block  24  Company | 12/23/20 | Approx 1:10 pm |

3. RULE VIOLATIONS ♦ VIOLACIONES

| 100.13 | FIGHTING |
|---|---|
| 104.11 | VIOLENT CONDUCT |
| 104.13 | CREATE DISTURBANCE |

4. DESCRIPTION OF INCIDENT ♦ DESCRIPCIÓN DEL INCIDENTE

ON THE ABOVE DATE + TIME ON THE WAY BACK TO HIS CELL FROM USING THE PHONE INMATE JUDE 17A0890 ATTACKED 24 COMPANY PORTER INMATE MONTOUR 12A3637 WITH CLOSED FIST PUNCHES. BOTH INMATES CONTINUED TO EXCHANGE CLOSED FIST PUNCHES. I CO S. PROTESZYN GAVE A DIRECT ORDER TO STOP. BOTH INMATES COMPLIED AND LOCKED IN. AREA SGT NOTIFIED INMATE JUDE WAS ESSCORTED TO RMU. INMATE MONTOUR WAS LOOKED AT BY MEDICAL STAFF ON UNIT. NO FURTHER INCIDENT.

| REPORT DATE ♦ FECHA | REPORTED BY ♦ NOMBRE DE LA PERSONA QUE HACE EL INFORME | SIGNATURE ♦ FIRMA | TITLE ♦ TÍTULO |
|---|---|---|---|
| 12/23/20 | S. Proteszyn | _(signature)_ | CO |

5. ENDORSEMENTS OF OTHER EMPLOYEE WITNESSES (if any)   SIGNATURES:
ENDOSOS DE OTROS EMPLEADOS TESTIGOS (si hay)   FIRMAS:   1. _____

2. _____   3. _____

NOTE: Fold back Page 2 on dotted line before completing below.

DATE AND TIME SERVED UPON INMATE  1-21-21  1:55 pm   NAME AND TITLE OF SERVER  M. Christian C.O.
FECHA HORA DADO AL RECLUSO   NOMBRE Y TÍTULO DEL QUE ENTREGA

You are hereby advised that no statement made by you in response to the charges or information derived therefrom may be used against you in a criminal proceeding. ♦ Por este medio se le informa que no se puede usar ninguna declaración hecha por usted como respuesta al cargo o la información derivada de ella en una demanda criminal.

## NOTICE ♦ AVISO

REVIEWING OFFICER (DETACH BELOW FOR VIOLATION HEARING ONLY)

You are hereby notified that the above report is a formal charge and will be considered and determined at a hearing to be held.   ♦ Por este medio se le notifica que
el informe anterior es un cargo formal el cual se considerará y determinará en una audiencia a celebrarse.

The inmate shall be permitted to call witnesses provided that so doing does not jeopardize institutional safety or correctional goals.   ♦ Se le permitirá al recluso llamar
testigos con tal de que el hacerlo no pondrá en peligro la seguridad de la institución o los objetivos del Departamento.

If restricted pending a hearing for this misbehavior report, you may write to the Deputy Superintendent for Security or his/her designee prior to the hearing to make
a statement on the need for continued prehearing confinement.   ♦ Si está restringido pendiente a una audiencia por este informe de mal comportamiento, puede
escribirle al Diputado del Superintendente para Seguridad o su representante antes de la audiencia para que haga una declaración acerca de la necesidad de
continuar bajo confinamiento, previo a la audiencia.

Distribution: WHITE - Disciplinary Office  ♦  CANARY - Inmate (After review)  ♦  Distribución: BLANCA - Oficina Disciplinaria  AMARILLA - Recluso (después de la región)

STATE OF NEW YORK - DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

__Wende__ Correctional Facility

## INMATE MISBEHAVIOR REPORT ♦ INFORME DE MAL COMPORTAMIENTO DEL RECLUSO

| 1. NAME OF INMATE (Last, First) ♦ NOMBRE DEL RECLUSO (Apellido, Nombre) | NO. ♦ NÚM. | HOUSING LOCATION • CELDA |
|---|---|---|
| Jude, S | 17A0890 | 24-11 |

| 2. LOCATION OF INCIDENT ♦ LUGAR DEL INCIDENTE | INCIDENT DATE ♦ FECHA | INCIDENT TIME ♦ HORA |
|---|---|---|
| D-Block 24-11 | 12/23/20 | Approx 1:25pm |

**3. RULE VIOLATIONS ♦ VIOLACIONES**

113.10 Weapon

**4. DESCRIPTION OF INCIDENT ♦ DESCRIPCIÓN DEL INCIDENTE**

ON THE ABOVE DATE & TIME I CO S. Kostyszyn
WAS SEARCHING INMATE JUDE'S 17A0890 CELL AFTER
FIGHT ON 24 COMPANY. WHILE SEARCHING THE CELL I
FOUND A TOOTH BRUSH THAT WAS MELTED TO A POINT
APPROX 4 INCHES by 1/2 INCH IN HIS LOCKER. Also FOUND FLAT
METAL PIECE SHARPENED TO A POINT WITH A WHITE SHREDDED
CLOTH AND CLEAR TAPE FOR A HANDLE Approx 6 INCHES by 1 INCH. UNDER
HIS MATTRESS AREA So? NOTIFIED. BOTH WERE SECURED TAKEN
OF FRONT TIER PHOTOS AND DROPPED INTO THE SECURE EVIDANCE
DROP BOX. PER DIRECTIVE 4910A.

| REPORT DATE ♦ FECHA | REPORTED BY ♦ NOMBRE DE LA PERSONA QUE HACE EL INFORME | SIGNATURE ♦ FIRMA | TITLE • TÍTULO |
|---|---|---|---|
| 12/23/20 | J. Kostyszyn | | CO |

**5. ENDORSEMENTS OF OTHER EMPLOYEE WITNESSES (if any)**   SIGNATURES:

ENDOSOS DE OTROS EMPLEADOS TESTIGOS (si hay)   FIRMAS:   1. _____

2. _____

**NOTE: Fold back Page 2 on dotted line before completing below.**

DATE AND TIME SERVED UPON INMATE __1/12/21   9.35am__   NAME AND TITLE OF SERVER __J Spanakos co__

FECHA Y HORA DADO AL RECLUSO   NOMBRE Y TÍTULO DEL QUE ENTREGA

You are hereby advised that no statement made by you in response to the charges or information derived therefrom may be used against you in a proceeding. ♦ Por este medio se le informa que no se puede usar ninguna declaración hecha por usted como respuesta al cargo o la información derivada en una demanda criminal.

## NOTICE ♦ AVISO

**REVIEWING OFFICER (DETACH BELOW FOR VIOLATION HEARING ONLY)**

You are hereby notified that the above report is a formal charge and will be considered and determined at a hearing to be held. ♦ Por este medio se le notif el informe anterior es un cargo formal el cual se considerará y determinará en una audiencia a celebrarse.

The inmate shall be permitted to call witnesses provided that so doing does not jeopardize institutional safety or correctional goals. ♦ Se le permitirá al recluso testigos con tal de que al hacerlo no pondrá en peligro la seguridad de la institución o los objetivos del Departamento.

If restricted pending a hearing for this misbehavior report, you may write to the Deputy Superintendent for Security or his/her designee prior to the hearing to a statement on the need for continued prehearing confinement. ♦ Si está restringido pendiente a una audiencia por este informe del mal comportamiento, escribirle al Diputado del Superintendente para Seguridad o su representante antes de la audiencia para que haga una declaración acerca de la neces continuar bajo confinamiento, previo a la audiencia.

Distribution: WHITE – Disciplinary Office   CANARY – Inmate (After review) ♦ Distribución: BLANCA – Oficina Disciplinaria   AMARILLA – Recluso (después de la reaIi

States two man fight, No level, means no alarm activate from body alarm due to breaking on command ✓

P. Block
[illegible]
12/23/2020

JUDE 12/23/20 1:10 pm

1:10 pm 2 man fight 2-4 company. No level. called Ofice to inmates breaking on command. Inmate Jude 174089 C (24-11) Inmate Montour 12A3637(24-16) Inmate Jude escarted to medical. Area Supervisor notified)



WENDE CORRECTIONAL FACILITY

INMATE NAME: Jude

DIN NUMBER: 17A0890

DATE & TIME: 12/23/20 / 1:42 pm

PHOTOS TAKEN BY: Sgt Barlow



I want to press charges for assault

FORM 1596 (11/11)        STATE OF NEW YORK - DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

## INMATE INJURY REPORT

| Facility Wende | Date of Injury 12/28/20 | Time of Injury 1:10 p | Location Injury Occurred JM Company |
|---|---|---|---|

| Inmate Name Jude Steven | | DIN 17A0890 | Housing Location JM-11 |

Report was cause of Inmate's Injury: illegal attack by another inmate

Inmate's Statement: I was jumped and stab in the face by inmate Cofric and another SRG Crip gang member club to the C.O.s killing Robert I dropped SRLS on him and the cops set me up to be attacked and stood (12/28/20) by and allowed it to occur

Inmate's Signature _____ Date 12/28/20

Witness(es): on a legally blind sensorially disabled white 24 company

Reporting Employee _____ Title _____

| Date Injury reported 12/28/20 | Time: 1:15 | Description of Injury: old head injury #2 small round 25th left skull area - reported hit head (Deep laceration above L eye old vision worse p attack 1.5 in long thin wide @ widest point. |
|---|---|---|

FRONT        BACK

OD (Right)

OS (Left)

| Date of medical examination 12/23/20 | | Time: 2pm |
|---|---|---|

Services Provided: area above cleansed c sterile water DSD applied POT Povidon to ECMC Field assessed @ dx infirmry

| Was inmate admitted to facility infirmary? ☐ Yes ☐ No | Outside hospital? ☑ Yes ☐ No If yes, where? ECMC | PCP on site evaluation? ☑ Yes ☐ No | Telemed evaluation? ☐ Yes ☑ No |
|---|---|---|---|

Name and title of person facilitating treatment at facility: X Jmil   Parkhel   RN 11

FORM 3105A (7/11)          STATE OF NEW YORK - DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
**AMBULATORY HEALTH RECORD PROGRESS NOTE**

| Name: Jude, Steven | DIN: 17A0890 | Date of Birth: 5/22/70 | Facility Name: Wende |
|---|---|---|---|

**Subjective:** injury reported complete "I was attacked on company by 2 inmates"

**Objective:** laceration above L eye in eyebrow 1/2 deep/wide

**Assessment:** c/o of striking head

**Plan:** swollen/reddened area back of head round apx 3.5" dandr of injuries

Last Name: Jude, S
DIN: 17A0890    Location: 84-11
Date: 1/8/18/00    Time: 1400
Provider Orders: per provider send to ECMC to via state for evaluation e Rx

Signature/Provider # _____    RN Transcribing Order/Provider #/Date/Time _____

**Subjective:** requesting water e pain meds educated unable to provide until evaluated by EMD

**Objective:** head injury

**Assessment:**

**Plan:**

Last Name: _____
DIN: _____    Location: _____
Date: _____    Time: _____
Provider Orders:

dense contact emergency contact e reluctantly admitted.

Signature/Provider # _____    RN Transcribing Order/Provider #/Date/Time _____

**Subjective:** Admit to infirmary

**Objective:** before 123/8 apply per order 104 vitals 28th resuming

**Assessment:**

**Plan:**

Last Name: Jude, S
DIN: 17A0890    Location: infirmary
Date: 12/23/18    Time: 9:30
Provider Orders:
Tylenol 650 BID
Timolol 0.25% 1 drop each eye BID
Mirtazapine 30mg QHS

Signature/Provider # _____ 297    RN Transcribing Order/Provider #/Date/Time _____

Continue entry into next box if necessary.

PAGE   2                          STATE OF NEW YORK              PRINTED AT
              DEPT OF CORRECTIONS AND COMMUNITY SUPERVISION   01/13/21  09:48 AM
                            UNUSUAL INCIDENT REPORT


    WENDE                   FAC CODE 430    FAC LOG# 200200    CCC# 292848

                                      CB LOG# 200088

    INCIDENT DATE  12/23/20  TIME 01:25 PM  LOCATION  CELL        OD 24 11S

      USE OF FORCE  NO      WEAPON USED  NO     WORKPLACE VIOLENCE  NO

**********************************************************************************
    ACTION TAKEN:                          (CONTINUED)
    DESCRIBED AS BEING METAL MEASURING 6 1/4" X 1" SHARPENED AT ONE END WITH A
    WHITE CLOTH AND TAPE HANDLE. AS A RESULT OF THE FIGHT, INMATE MONTOUR WAS
    EXAMINED BY MEDICAL STAFF INDICATING NO INJURIES. INMATE JUDE WAS EXAMINED
    BY MEDICAL STAFF WHO NOTED; A SMALL 2.5" RED SWOLLEN AREA ON THE BACK OF
    HIS HEAD AND A 1.5" LACERATION ABOVE HIS LEFT EYE. SGT. BARLOW DETERMINED
    JUDE'S INJURIES WERE CONSISTENT WITH FIGHTING. JUDE WAS TAKEN TO ERIE
    COUNTY MEDICAL CENTER FOR FURTHER EXAMINATION VIA STATE VAN.
    INMATE MONTOUR WAS PLACED ON KEEPLOCK ██████████.
    UPON RETURN FROM ERIE COUNTY MEDICAL CENTER INMATE JUDE WILL BE PLACED IN
    SHU. THE WEAPONS WERE PHOTOGRAPHED AND SECURED IN ACCORDANCE WITH
    DIRECTIVE 4910A. ACTING DSS, CAPT. HODGES WAS NOTIFIED.


    MEDICAL REPORT:

      INMATE MONTOUR NO INJURIES NOTED.
      INMATE JUDE HAD A SMALL 2.5" RED SWOLLEN AREA ON BACK OF HIS
      HEAD AND 1.5" LACERATION ABOVE HIS LEFT EYE DUE TO THE FIGHT.

        L. PRISHEL           /NURSE                    12/23/20  02:00 PM
                      EXAMINER NAME/TITLE               EXAM DATE/TIME


    ****************************************************************************
    PROPERTY DAMAGE:

      NONE


    ****************************************************************************

```
PAGE   1                           STATE OF NEW YORK                  PRINTED AT
                    DEPT OF CORRECTIONS AND COMMUNITY SUPERVISION     01/13/21  09:48 AM
                                   UNUSUAL INCIDENT REPORT


          WENDE                      FAC CODE 430      FAC LOG# 200200    CCC# 292848

                                              CB LOG# 200088

          INCIDENT DATE   12/23/20  TIME 01:25 PM  LOCATION  CELL        OD 24 11S

          TELEPHONE DATE  12/23/20  TIME 05:29 PM

             PERSON CALLING     LT    ROBERTS
             PERSON RECEIVING   CAPT              DELMAR

          REPORT DATE     12/30/20     PERSON REPORTING LT    J. EBERHARDT

             USE OF FORCE  NO      WEAPON USED  NO     WORKPLACE VIOLENCE  NO

          ************************************************************************

          CONTRABAND                   (03) 21       CONTRABAND
             WEAPON - TOOTHBRUSH                         WEAPON - SHANK        (03) 13

          ************************************************************************
```

DESCRIPTION:

OFFICER KOSTYSZYN OBSERVED INMATE JUDE 17A0890 (D-24-11) AND INMATE MONTOUR 12A3637 (D-24-16) EXCHANGING CLOSED FIST PUNCHES ON D-BLOCK 24 GALLERY. KOSTYSZYN ORDERED THE INMATES TO STOP FIGHTING AND THEY COMPLIED. SGT. BARLOW WAS NOTIFIED AND RESPONDED. BARLOW AUTHORIZED A FRISK OF BOTH INMATE'S CELLS. WHILE FRISKING INMATE JUDE'S CELL INSIDE THE LOCKER OFFICER KOSTYSZYN RECOVERED A TOOTHBRUSH TYPE WEAPON.

```
          ************************************************************************
```

EVENTS CAUSING:

DURING A CELL FRISK, OFFICER RECOVERED TWO WEAPONS.

```
          ************************************************************************
```

ACTION TAKEN:

OFFICER KOSTYSZYN CONTINUED THE CELL FRISK AND UNDERNEATH THE MATTRESS HE RECOVERED A METAL SHANK TYPE WEAPON. THE CELL FRISK WAS COMPLETED, WITH NO OTHER CONTRABAND RECOVERED. NO CONTRABAND WAS RECOVERED FROM INMATE MONTOUR'S CELL. THE TOOTHBRUSH TYPE WEAPON WAS DESCRIBED AS BEING 4 1/2" X 1/2" MADE OF PLASTIC SHARPENED AT ONE END. THE SHANK TYPE WEAPON WAS



**NEW YORK STATE**

# Corrections and Community Supervision

ANDREW M. CUOMO
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

## MEMORANDUM

To:       Lieutenant T. Roberts

From:    Sergeant K. Barlow

Subject:  UI# 20-0200 Weapons

Date:     12/23/20

On the above date at approximately 1:25pm Officer S. Kostyszyn was searching inmate D-24-11 Jude 17A0890 cell following a fight that took place on the company. He discovered a green toothbrush sharpened to a point approximately 4.5 inches in length and .5 inches wide. This was discovered in a locker. The search continued and a 6.25 inches by 1 inch metal shank with a white cloth wrapped handle formed to a point was discovered under his mattress. No additional contraband was discovered. Misbehavior Report was written by Officer Kostyszyn. The inmate is at this time at outside hospital ECMC.

The weapons were confiscated and photographed and placed in the secure evidence drop box per directive 4910A.

Respectfully Submitted,

*K. Barlow*

Sergeant K. Barlow

# FIGHT INVESTIGATION FORM

TO WATCH COMMANDER

DATE: 12/23/20

FROM: Sergeant K. Barlow

1.  (a)Jude  17A0890        D-24-11     Aggressor:  Yes ☒  No ☐  Unk. ☐
    Inmate Name & Number      Cell Location     Race:  WH ☐  BL ☒  HS ☐

    (b)Montour  12A3697      D-24-16     Aggressor:  Yes ☐  No ☒  Unk. ☐
    Inmate Name & Number      Cell Location     Race:  WH ☐  BL ☒  HS ☐

2.  Location of Incident: 24 Company       Date: December    Time: 1:10pm
                                   23, 2020

3.  Was forced used? Yes ☐  No ☒

4.  Has medical attention been given to inmate:   (a) Yes ☒  No ☐  Refused ☐
                                             (a) Yes ☒  No ☐  Refused ☐

5.  Describe any injuries   (a) 1.5 in long laceration over left eye, red spots on back of head
                          (b) No injuries

6.  Was a weapon involved   (a) Yes ☐  No ☒  Description
                            (b) Yes ☐  No ☒  Description

7.  Have pictures of the weapon(s) been taken?  Yes ☐  No ☒

8.  Where is the weapon(s) now?  (a)N/A          (b)N/A

9.  Does inmate(s) want protection? (a) Yes ☐  No ☒     (b) Yes ☐  No ☒

10. Does inmate(s) want to press charges? (a) Yes ☒  No ☐     (b) Yes ☐  No ☒

11. Inmate(s) explanation(s): _Inmate Jude states that he was attacked on the company while returning to his cell after using the telephone. Inmate Montour states that he was out on the company performing his porter duties and had to defend himself against an attack from inmate Jude. Neither inmate would reveal what the underlying cause of the altercation was.

12. Sergeant's assessment (conclusion): _Officer S. Kostyszyn observed inmate Jude strike inmate Montour with a closed fist punch on his way back to his cell on 24 company. He then further observed inmate Montour proceed to defend himself and strike back with closed fist punches. Officer Kostyszyn gave a direct order to stop fighting and the inmates complied. Inmate Jude was bleeding from a cut above his left eye. He was taken to the RMU for medical evaluation. Inmate Montour did not appear to have any injuries. He was held in the block and medical personnel evaluated him on 24 company with no injuries noted. When interviewed neither inmate gave a reason for the altercation. Both inmates cells were frisked. The frisk of inmate Montour's cell did not yield any contraband. During the search of inmate Jude's cell two shanks were found. See UI# 20-0200._ Both inmates were confined pending disciplinary action.

\* To be attached to Misbehavior Report (s)          _K. Barlow_
and or Unusual Incident Report(s)                        Sergeant

# Prisoners' Legal Services of New York

237 Main Street, Suite 1535
Buffalo, New York 14203
Tel.: (716) 854-1007
FAX: (716) 854-1008

LEGAL MAIL
CONFIDENTIAL

**Karen Murtagh-Monks**
**Executive Director**

**Maria E. Pagano**
**Managing Attorney**

November 1, 2010

Brian Fischer, Commissioner
NYS – Department of Correctional Services
1220 Washington Avenue
Building 2, State Campus
Albany, NY 12226-2050

**RE: UNIT WIDE ALLEGATIONS OF TITLE II (Subtitle A) ADA VIOLATIONS AND
ASSAULTS AND THREATS BY STAFF AT THE WENDE CORRECTIONAL
FACILITY  SENSORIALLY DISABLED PROGRAM**

Dear Mr. Fischer:

We are writing this letter on behalf of the inmates housed in the Sensorially Disabled
Program (SDP) at Wende Correctional Facility (C.F.), many of whom have been housed
previously at SDP's at Eastern and Sullivan C.F.s.  We have received complaints from and have
interviewed a number of inmates regarding (1) lack of reasonable accommodations under the
Americans with Disabilities Act (ADA), (2) problems with mobility escorts (3) violations of
inmates' privacy rights and (4) serious allegations of assaults, including sexual, and other
misconduct by corrections officers. This letter will detail some of the remarkably consistent
allegations received by our office and also provide recommendations regarding addressing
correcting any violations.

We thank you in advance for your prompt attention to this serious matter.

**REASONABLE ACCOMMODATIONS UNDER THE ADA, DIRECTIVE 2612 AND 2614, AND WENDE
C.F. POLICY AND PROCEDURE FOR THE SENSORIALLY DISABLED INMATES
PROGRAMS/SERVICES**

1

Title II of the Americans with Disabilities Act (ADA) mandates that State and local entities are prohibited from discriminating against persons with disabilities and must make "reasonable accommodations" for such disabilities. State and local entities are required to provide disabled inmates with reasonable accommodations to allow these inmates to participate in the programs, activities, and services offered by the facility. In the prison context, the ADA requires that disabled inmates be provided the same opportunities as non-disabled inmates in accessing to programs, activities and services.

DOCS Directives 2612 and 2614 and Wende C.F.'s local directives were issued to effectuate Title II (Subtitle A) of the ADA.

**Shower Fixtures**

Inmates have complained about the lack of rails in the showers. The lack of these fixtures prevents blind/visually impaired inmates from accessing shower services in a manner equal with non-disabled inmates and presents a health and safety hazard. As DOCS Directive 2612 states, ". . . the programs and services provided to inmates . . . must ensure accessibility and usability by qualified inmates in the most integrated setting." The primary concern here is usability. Non-disabled inmates are provided full use of showers and incur no burden in using them. Conversely, blind/visually impaired inmates' use of showers is substantially compromised because they are forced to negotiate the slippery and hazardous shower surface without any fixture to support themselves. The lack of rails poses a serious safety risk to blind/visually impaired inmates because they are more likely to fall and be injured in the shower. Directive 2612 mandates the installation of such fixtures because DOCS must make existing facilities readily accessible to meet a particular individual's needs. The lack of shower rails is a violation of the ADA and DOCS' policy. Accordingly, we request that shower rails be installed to make showers readily accessible for blind inmates as required by the ADA.

Additionally, we have received complaints that mobility escorts are allowed seven showers per week while blind inmates are allowed only two to three per week. If this is correct, then either the blind/visually impaired inmates are being denied equal access or the mobility escorts are receiving preferential treatment. In either case, the treatment is disparate.

2

## Access to the Resource Room

SDP inmates report lack of access to the resource room. Access to the resource room is essential for SDP inmates because it contains equipment including computer audio systems and Braille writing equipment which allow them to read and compose their mail, including legal documents, and write grievances and other documents. Without access to this room, many inmates on the SDP are effectively barred from reading their mail and corresponding with their loved ones and legal representatives.

The official policy regarding the operational hours of the resource room is unclear. Wende C.F. Directive 4017 states that the resource room will be operational Monday through Friday from 9 A.M. to 11 A.M. and 1 P.M. to 3 P.M. However, in response to an inmate grievance, the Superintendent stated that, "No inmates are permitted to enter the resource room after 10 A.M. in the morning or after 2 P.M. in the afternoon." ( Exhibit A). On this schedule, access to the resource room would be restricted to the following times: 9 A.M. to 10 A.M. and 1 P.M. to 2 P.M. This restriction is not contained in Directive 4017 and such a restriction is a direct contravention of the operational hours established by the Directive.

Moreover, Wende Directive 4017 is irreconcilable with DOCS directive 2612. DOCS directive 2612 explicitly states that (1) sound amplification and assistive listening devices and (2) Braille equipment/print will be made available as needed. Based on our understanding, the above devices are available *only* in the resource room, which is purported to be accessible for only 20 hours per week. Providing these devices for only 20 hours a week, or 10 hours per week as is noted in the Superintendent's grievance response, cannot be construed as providing access on an as needed basis. Such minimal hours of operation do not provide any meaningful access to the resource room and violate the ADA as well as DOCS directive 2612.

DOCS directive 2612 states that facilities shall make available to deaf and hard of hearing inmates the auxiliary aids, services, and assistive devices as approved through the reasonable accommodation process which are necessary to facilitate full and effective participation in prison programs, activities, and services. Non-disabled inmates are able to read their mail and write letters at nearly any time of day.

3

Such restrictive access to the resource room for SDP inmates is inadequate and a direct violation of the ADA. In order to comply with the ADA, the hours of the resource room should be expanded to provide meaningful access for disabled inmates which would include on an as needed basis.

Additionally, we have been notified that there is no SARA or V-Text in the resource room which is required in order to provide reasonable accommodations to the blind/visually impaired.

## Access to Food

A number of blind/visually impaired inmates have notified us that they are not permitted to go to the messhall to eat with the general population and that they are forced to eat alone in their cells where there food is brought to them in small trays, smashed all together and cold. They report receiving less food than inmates in general population. The ADA requires that a blind/visually impaired inmate be provided with mobility aid so that they can have access to the messhall.

## Inmate Mobility Assistants

We have received complaints from SDP inmates that many of the inmate mobility assistants (1) are known gang members, specifically, Bloods, (2) steal from blind/visually impaired inmates, (3) extort and intimidate SDP inmates, and (4) are not properly trained to escort blind inmates.

Wende Directive 4017 deals, in part, with the responsibilities, training, and qualifications for inmate mobility assistants. According to this Directive, the primary function of a mobility assistant is to escort and assist the blind/visually impaired throughout the facility. In order to qualify as a mobility escort for blind/visually impaired inmates, the escort must (1) have a high school diploma or GED or currently be working toward one, (2) have a criminal history free of predatory offenses, and (3) have a satisfactory disciplinary record since his incarceration. Inmates who are known gang members are not categorically prohibited from becoming mobility assistants. Permitting known gang members to function as inmate mobility assistants poses a serious threat to some of the most vulnerable state prison inmates as these inmates need to trust

4

and rely on the mobility assistant. It also poses a threat to the general safety and security of the facility. We request that all mobility assistants be investigated for possible gang membership and that any identified gang members be removed from the SDP program. We also request that Directive 4017 be amended to categorically preclude known gang members from functioning as inmate mobility assistants.

Directive 4017 also addresses the training that is provided to inmate mobility assistants for the blind/visually impaired. Pursuant to this directive, mobility assistants are trained by a staff instructor in the following areas: (1) mobility assistant techniques, (2) emotional well-being of blind inmates, (3) use of landmarks and cues, (4) obstacles, (5) doorways, and (6) stairs. However, the directive fails to specify the length of the training provided and whether the trainees are required to pass any minimum test of competency before functioning as a mobility assistant.

Mobility assistants provide an essential service to blind/visually-impaired inmates who rely on these escorts for many basic functions such as attending assigned programs, medical and mental health appointments, and recreation programs. Blind/visually impaired inmates also require escorts to fulfill custodial needs including access to commissary and the package room. Given the importance of the mobility escort role and the dependence of blind/visually impaired inmates on this role, we request that any inmate who applies or is appointed to be a mobility assistant be required to demonstrate a minimum level of competency in aiding blind/visually impaired inmates before being permitted to be a mobility escort. While mobility assistants are required to undergo training, this does not guarantee competency. An inadequately mobility assistant could pose a serious safety risk to blind inmates, especially in cases where the escort must navigate a blind inmate around obstacles or down stairwells.

### Recreation, Television and Closed Captioning/Headphones

SDP inmates report that there is no separate recreation area for them and their access to recreational activities is severely limited. They report that recreation leaders are not trained in recreational activities for the sensorially disabled and that there is no closed caption television or headphones available to them. SDP inmates should be provided with the same access to recreational activities as non-sensorially disabled inmates.

5

### Canes

We have received reports that blind/visually impaired inmates are being forced to use canes without a medical determination that they need to use one. We have also received reports that inmates are forced to use a cane when the cane actually compromises their ability to function. They report that they cannot go to recreation since they are not allowed to leave their canes unattended. When they go to and from commissary and the package room they cannot use a cane and carry their belongings at the same time. This problem is compounded because they are forced to go to the package room when their mobility aid wants to go, and the mobility aid is not available to assist them with carrying packages because he is carrying his own.

The requirement that all blind/visually impaired inmates use a cane violates the ADA because the need for use of a cane is a medical determination which only a physician can make. This is because only a physician can diagnose an individual's unique sight impairment and need for an assistive device and reasonable accommodation. A general policy that all blind/visually impaired inmates are required to use a cane is discriminatory and violates the ADA.

Moreover, the mandatory cane policy is overinclusive and fails to adequately distinguish between variable degrees of individual visual impairment. Such a policy is tantamount to requiring all inmates with mobility impairments to use wheelchairs without any assessment of the particular individual's ability to walk. Categorically grouping all visually impaired inmates into the sub-group of inmates who require canes is discriminatory because it fails to consider the individual needs and capabilities of particular inmates. Many visually impaired inmates do not need canes and are actually hampered by cane use.

Additionally, mandatory cane use imposes a significant burden on the independence of visually impaired inmates who do not require canes. Wende Directive 4017 stresses the importance of allowing blind inmates the greatest degree of independence. In defining the role of the Inmate Mobility Escort, the Directive states that the escort should "allow the blind/visually impaired inmate to use the method of travel which affords him the most independence." Given that Wende C.F. has recognized the value in granting blind/visually impaired inmates the most independence regarding their mode of travel, this policy should logically be applied to cane use as cane use pertains to mode of travel. Canes should only be required for inmates who need

6

them as determined by a physician. Inmates who are able to travel without canes should have their independence respected.

## Interpreter Services and other Reasonable Accommodations for the Deaf/Hard of Hearing

Deaf/ hard of hearing SDP inmates have notified us that they are not receiving consistent interpreting services as required by the ADA and the Clarkson settlement agreement. In particular, we have been advised that they are not consistently receiving interpreter services when they are interacting with medical, mental health or guidance staff. Additionally, inmates are expected to read the lips of correctional officers which is not a reasonable accommodation as lip reading is never adequate because of the quantity of information that is missed even by a person expertly trained in lip reading. Cue cards are being used by staff inconsistently and deaf/hard of hearing inmates are expected to follow corrections officers' direct orders without cue cards which have resulted in SDP inmates being issued misbehavior reports. The inconsistent use of cue cards appears to be related to escalation in confrontations between staff and inmates as well.

Deaf/Hard of Hearing SDP inmates have also reported that they have been denied access to a CCTV in violation of the ADA.

## Assaults by Staff and Retaliation for Filing Grievances and Complaints

SDP inmates report that they are subject to discrimination by staff members, including corrections officers and SPD staff. We have received numerous complaints ranging from mocking and intimidation to physical and sexual assaults. Both deaf/hearing impaired and blind/visually disabled SPD inmates notified us that they are retaliated against by corrections officers when they file grievances based on ADA reasonable accommodations or because of maltreatment by corrections officers.

SPD inmates have notified us that corrections officers grab SDP inmates' genitals while conducting frisks, particularly, but not exclusively, blind/vision impaired inmates. Such staff conduct is a direct violation of DOCS Directive 4910 which requires personal searches to be conducted in a manner that is not offensive to the dignity of the inmate being searched. Moreover, Directive 4028A states that DOCS has a zero tolerance policy for sexual abuse and

iterates that "every incident of staff sexual abuse of an inmate presents a threat to the security of the facility and the department."

The Prison Rape Elimination Act of 2003 (PREA) also addressed the issue of inmate sexual abuse and found that "Most prison staff are not adequately trained or prepared to prevent, report, or treat inmate sexual assaults." While Directive 4028A establishes training procedures for staff regarding the prevention, detection, response, and investigation of sexual abuse, these procedures are entirely inadequate. Pursuant to DOCS Directive 4028A, staff are required to receive this training upon hiring and then only once every three years. Given the high prevalence of inmate sexual abuse, which is reported at an alarmingly high rate at Wende C.F. as discussed below, we request that the training procedures be reconsidered to provide more frequent in-service training for staff regarding inmate sexual abuse.

Based on a report authored by the Correctional Association of New York in 2010, reports of sexual abuse are significantly higher at Wende than at other correctional facilities in New York. 70% of inmates at Wende who responded to the survey conducted by the Correctional Association of New York reported experiencing at least one abusive pat frisk and 31% of respondents reported experiencing them frequently. Moreover, 91% of survey respondents believe that Wende's administration does very little or nothing to prevent staff abuse of inmates. Inmates in the SDP, and in particular, blind/vision impaired inmates, are vulnerable to this type of abuse by virtue of their physical impairment and are often targeted because of their disabilities. This abuse not only violates the rights and personal dignity of inmates, but also may pose a threat to institutional security. As such, in accord with the recommendation of the Correctional Association of New York, we request that grievances and pat frisk procedures be reviewed to assess the prevalence of sexual or abusive conduct by staff and to identify measures to reduce this behavior.

In addition to sexual abuse, inmates on the SDP report being verbally harassed and ridiculed by staff on the basis of their disabilities. Again, the report of the Correctional Association of New York supports these claims. 78% of respondents indicated that verbal harassment occurred frequently at Wende. It appears that verbal harassment of SDP inmates may be related to a lack of staff training and an understanding of disability in general. Inmates on the SDP reported that harassment often occurs as a result of communication barriers between SDP

inmates and staff. It seems that at least some of the staff on the SDP are either not trained sufficiently in how to work with disabled inmates or they lack the sensitivity and respect necessary to work with such inmates. A lack of training in how to effectively communicate and work with disabled inmates is problematic because it may lead to conflicts between corrections staff and inmates as has been documented by inmates in the SDP at Wende C.F. In many cases, these communication problems can escalate into physical confrontations.

We have received complaints of corrections officers intentionally mocking particular inmates because of their disabilities. This type of verbal abuse of inmates evinces a complete lack of sensitivity to disabled individuals and is detrimental to staff inmate relations. In order to improve the staff inmate relations on the SDP, these training and sensitivity issues must be addressed immediately. As such, we request that staff on the SDP be required to undergo (1) sensitivity training related to dealing with disabled inmates and (2) training on how to effectively communicate with disabled inmates. Deaf Adult Services of Western New York has offered to train corrections staff on how to effectively work with deaf inmates. Further, we request that grievances regarding verbal harassment of SDP inmates be investigated to determine the prevalence of such abuses.

Additionally, SPD inmates report that they are retaliated against by corrections officers for filing grievances, and that grievances are not being forwarded to the ADA Coordinator. They report that they are threatened, intimidated and physically assaulted for filing grievances related to mistreatment by corrections officers and for filing complaints regarding lack of reasonable accommodations.

We have recently received disturbing reports from numerous individuals that a deaf/hard of hearing SDP was brutally beaten by corrections officers at Wende C.F. We ask that you take swift action regarding these allegations to prevent further potential abuse of SDP inmates..

<u>**Violations of SDP Inmates' Confidentiality**</u>

We have also received complaints from SDP inmates that confidentiality in the "Program Eligibility" setting is being breached. Based on our understanding, in order to qualify for particular programs, disabled inmates must participate in a "Program Eligibility" meeting with the Program Committee. These meetings take place in the law library in the presence of other

9

inmates who are able to hear conversations between the disabled inmates and the committee. This revelation of disabled inmates' medical information is highly problematic as such a practice violates Constitutionally protected privacy rights and New York State Public Officers Law §74(3)(c).

Public Officers Law§74(3)(c) states, in part, "No officer or employee of a state agency . . should disclose confidential information acquired by him in the course of his official duties . . ." The disclosure of private medical information regarding particular inmate disabilities to other inmates in the law library violates this law. Such disclosures may place disabled inmates at higher risk of attack and harassment depending on the nature of the disability that is disclosed to other inmates. Moreover, medical information relating to disabilities is often highly sensitive, personal information. Broadcasting such information to any other inmates within audible range demonstrates a complete lack of regard for the Constitutionally protected privacy rights of inmates recognized in Powell v. Schriver, 175 F.3d 107 (2d Cir. 1999).

Prison inmates do not shed all fundamental protections of the Constitution at the prison gates. Hernandez v. Coughlin, 18 F.3d 133 (2d Cir. 1994). The right to maintain the confidentiality of previously undisclosed medical information is among the rights retained by prison inmates. Powell, 175 F.3d 107 (2d Cir. 1999). Moreover, any regulation that impinges on inmates' constitutional rights is valid only if it "is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78 (1987).

Here, the procedures surrounding the program eligibility meetings violate inmates' privacy rights regarding medical information. The program eligibility meeting is a precondition to qualify for particular programs. Without attending this meeting, disabled inmates cannot participate in particular programs. The setting in which this meeting takes place requires disabled inmates to disclose medical information to not only the Program Committee, but also any other inmates who are present in the library. Essentially, disabled inmates are compelled to disclose private medical information to third parties in order to qualify for programming.

Additionally, there are no legitimate penological interests that justify such a procedure. In fact, the current procedures may actually undermine institutional security. The disclosure of the specific nature of disabled inmate's condition to other inmates may place certain disabled

inmates at greater risk of assault, harassment, or discrimination. Requiring confidentiality in this setting not only protects the privacy rights of disabled inmates, but may also aid institutional security.

## Conclusion

In consideration of the very serious allegations discussed above, which include both ADA violations and staff misconduct in the Wende C.F. SDP, we ask that your office initiate a thorough review and investigation of the SDP at Wende C.F. and that supervisory staff address these allegations in a timely manner.   We request that all SDP staff, including the SDP Program Supervisor, be evaluated to ensure that they have the certifications and training required in order to both work with the sensorially disabled and to train others to do so.  We request that all medical and mental health staff be evaluated to ensure that they have the required amount of training to be able to properly diagnose the medical and mental health conditions of the sensorially disabled.  Further, we also request supervisory staff ensure that no SPD inmates be retaliated against for filing grievances, contacting PLS, or making complaints related to issues contained in this letter or for any other issues not addressed in this letter.

Finally, we have received reports from numerous SDP inmates at Wende C.F. that their experiences at Eastern C.F. and Sullivan C.F. SDP programs were positive, that staff at these programs were respectful to the inmates, and that these programs were in compliance with the ADA and DOCS own directives.  These programs may be able to provide the Wende C.F. SDP program with advice and assistance in order to come into compliance with the ADA and in order to ensure that all staff in the program are properly trained and staff assignments are appropriate. We are available to work with any DOCS staff regarding addressing both SDP unit wide complaints and individual SDP inmate complaints related to ADA reasonable accommodations and staff issues as they relate to discrimination and harassment. We are also available to assist in identifying and scheduling trainings regarding working with the sensorially disabled.

We thank you in advance for your immediate attention to these very serious allegations from SDP inmates.   Kindly contact us at (716) 854-1007 ext. 28 if you have any questions or concerns related to these matters.

11

Sincerely,

Anthony Giannetti
Law Intern

Maria E. Pagano
Managing Attorney

cc: Anthony Annucci, Executive Deputy Commissioner & Counsel
    Robert Kirkpatrick, Superintendent, Wende C.F.
    Karen Crowley, Deputy Superintendent of Program Services, Wende C.F.
    Bryan Bradt, SDP Program Supervisor
    Lucy Buther, ADA Coordinator
    Deborah Nazon, Acting Director, Office of Diversity Management
    Richard Roy, Inspector General

In the United States District Court
For the Western District of New York

--------------------------------------------------------------X

KEVIN BROWN, et, al   Plaintiff,          :

      v.                                              :

                                  :

STEVEN JUDE,                                   :

                   Defendants        :

--------------------------------------------------------------X

**Request to Proceed
In Forma Pauperis**

Civil Action No._____

PLEASE TAKE NOTICE, that upon the declaration of STEVENJ JUDE, sworn to on the

April 2, 2021, a motion will be made at a term of this court, for an order permitting income

and property to enable him to pay the cost, fees, and expenses to pursue said action, and for

such other and further relief as this Court may deem just and proper.

Signed this 2, day of 2021-04-01

Steven Jude# 17-A-0890

To:_____
Clerk
United States District Court
For the Western

3

Wende Correctional

3040 Wende Rd

P O Box 1187    21  CV 654

Alden NY 14004

U.S Chief Judge          5-10-21

United States District Court

Western District of New York

2 Nigara Square

Buffalo , NY 14202

Dear Chief Judge:

Enclosed is a 1983 USC complaint

which I previously written to you

about, I am requesting that any order

recommendation or printed report, that

only my initials be used and not

my entire name, as prisoners have

access to west law and other

search engines and the contents of

my complaint if read by other

prisoners could cause me further

LS&S  LLC          1-800-468-4789

2

harm and/or to be assaulted as plaintiff still has a state and federal sentence to serve.

The defendants recently retaliated Against Me Again, beat Me up and denied me medical attention for my injuries.

I would Appreciate if you would only print My initials in whatever printed recommedation or report issued by the court, to prevent further harm to the plaintiff

Thank you ahead of time for your cooperation and consideration in these regards

Respectfully

Steven Fude

LS&S LLC                                      1-800-468-4789

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

*Steven Jude*

**DEFENDANTS**

*Kevin Brown, et al*

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

*Pro Se*

Attorneys *(If Known)*

*21 CV 654*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☑ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☑ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 540 Mandamus & Other | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☑ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
*1983 42 USC 1983*

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

- ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE *Vilardo* MAG. JUDGE _____

Steven Jude #17-A-0892
Wende Correctional Fa
3040 Wende Rd
P.O. BOX 1187
Alden, N.Y. 14004-

CORRECTIO
?
CORRECTIO

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE
CERTIFIED MAIL®
7018 2290 0000 1184 6256

JUDE

ERIN TU
Supervisory Pr
United States
Western Distr
2 Niagra
Buffalo, N

USDC WDNY
MAY 19 2021
BUFFALO

770
Blue

"LEGAL MAIL"

PLACE STICKER AT
OF THE RETURN ADDRE
CERTIFI

ENDE
NAL FACILITY

NEOPOST
05/17/2021
US POSTAGE $005.00º
ZIP 14004
041M11281621

PURPLE HEART
FOREVER USA
2019
PURPLE HEART
FOREVER USA
2019

NDE
AL FACILITY

NEOPOST
PRIORITY MAIL
05/17/2021
US POSTAGE $008.10º
ZIP 14004
041M11281621

MAY 17 2021
USPS

BBS. Esq
Se law Clerk
District Court
ct of New York
Square
ew York 14202

"LEGAL MAIL"