UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| STEVEN JUDE | : | |
| | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | **ECF CASE** |
| | : | |
| NEW YORK STATE DEPARTMENT OF | : | **FOURTH AMENDED AND** |
| CORRECTIONS AND COMMUNITY | : | **SUPPLEMENTAL** |
| SUPERVISION, DANIEL F. MARTUSCELLO, | : | **COMPLAINT** |
| KEVIN BROWN, KEVIN BARLOW, THOMAS | : | |
| WHITE, JOSHUA LIS, MARGARET STIRK, | : | **21-cv-654 (LJV)(LF)** |
| DONALD LOCKWOOD, ROBERT BIZUB, | : | |
| STEVEN KOSTYSZYN, CARMEN BURKHART, | : | |
| FRANK PFONNER, CONOR EWING, LEAH | : | |
| SZABLEWSKI, CHRISTY R. MISKELL, STEPHEN | : | |
| DIFFENDERFER and ANTHONY SCERE | : | |
| | : | |
| Defendants. | : | |
| | : | |

Plaintiff Steven Jude, by and through his counsel, Law Office of Amy Jane Agnew, P.C.,

amends and supplements his complaint as follows:

## PRELIMINARY STATEMENT

This is a civil rights action filed by Steven Jude ("Mr. Jude" of "Plaintiff"), a legally blind

incarcerated individual in the custody of the New York State Department of Corrections and

Community Supervision ("DOCCS"). Mr. Jude is presently incarcerated at Five Points

Correctional Facility ("Five Points"). Mr. Jude's claims are brought pursuant to 42 U.S.C. § 1983,

the Americans with Disabilities Act of 1990 ("ADA"), 42 USC § 12112 *et seq* and the

Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794. DOCCS operates at least three units

in maximum security prisons defined as Sensorially Disabled Units ("SDU") and each runs a

Sensorially Disabled Program ("SDP") for each unit.  In 2015, DOCCS and a class of visually impaired plaintiffs entered into a Private Settlement Agreement ("PSA") guaranteeing certain reasonable accommodations to class members, including assistive devices, resource room hours, instruction, and other auxiliary aides.  *Medina, et al. v. Buther, et al.,* 11-cv-176 (LAP)(JLC) ("*Medina I*").  The PSA naturally dissolved in 2017 with the intention that DOCCS would learn from the legal exercise and lasting reforms would stay in place.  Unfortunately, once the PSA naturally terminated, DOCCS quickly rescinded the protections to the sensorially disabled afforded by the *Medina I* PSA.  This lawsuit stems from the resulting deficiencies and violations of federal rights suffered by Plaintiff, as well as several other federal civil rights violations.

## JURISDICTION & VENUE

1.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(3).

2.      The Western District of New York is an appropriate venue under 28 U.S.C.§ 1391 (b) (1) and (2).

3.      "DOCCS" receives federal funding to operate its correctional facilities, and thus must comply with Title II of the ADA and Section 504.

## JURY DEMAND

4.      Plaintiff demands a trial by jury.

## PARTIES

5.      **Plaintiff Steven Jude** ("Plaintiff" or "Mr. Jude") is and was at all relevant times a legally blind incarcerated individual who has been in DOCCS' custody since 2004. Plaintiff 's legal blindness substantially impairs his ability to communicate, read and write.  As a legally blind incarcerated individual, DOCCS must house Mr. Jude in a Sensorial Disabled Unit ("SDU") in a

DOCCS' facility.  Three maximum security facilities incorporate SDUs: Sullivan Correctional Facility, Eastern NY Correctional Facility and Wende Correctional Facility ("Wende").

6.    **Defendant New York State Department of Corrections and Community Supervision** ("DOCCS") is responsible for the care, custody, and control of incarcerated individuals in the custody of the State of New York.  DOCCS receives federal and state funding to support their programs and services.  DOCCS is sued under the ADA and Rehabilitation Act and for injunctive relief purposes.

7.    **Daniel F. Martuscello ("Martuscello")** is the current acting Commissioner of DOCCS.  Mr. Martuscello is sued in his official capacity for injunctive purposes.

8.    **Christopher Yehl** ("Yehl") is the Superintendent at Wende Correctional Facility ("Wende") and recently replaced Stewart Eckert.  As Superintendent, Yehl is responsible for the creation and implementation of all policies and procedures that are facility specific, including those delineated in the Facility Operations Manual.  Yehl is also the chief administrative officer in charge of the safety and security of incarcerated individuals at Wende.

9.    **Defendant Kevin J. Brown** ("Defendant Brown") was the Deputy Superintendent of Security at Wende.  As Deputy Superintendent, Defendant Brown is responsible for the implementation of all policies and procedures at Wende regarding the safety and security of incarcerated individuals.  Defendant Brown is also responsible for housing, classification, job, and program assignments.  Defendant Brown is sued in his individual capacity.

10.    **Defendant Donald Lockwood ("Defendant Lockwood")** is a Correctional Captain at Wende. He is sued in his individual capacity.

11.    **Defendant Margaret Stirk** ("Defendant Stirk") was the Chief of the Forensic Mental Health Unit at Wende. She is employed by the Office of Mental Health ("OMH").

Defendant Strik is in charge of the mental health care of all mental health patients at Wende. Defendant Stirk is sued in her official capacity.

12. **Defendant Kevin Barlow** ("Defendant Barlow") is a Correctional Sergeant at Wende. Defendant Barlow is responsible for the care, custody, and control of inmates and first line supervision of security staff at Wende. Defendant Barlow is sued in his individual capacity.

13. **Defendant Robert Bizub** ("Defendant Bizub") is a Correctional Sergeant at Wende. Defendant Bizub is responsible for the care, custody and control of inmates and first line of supervision of security staff at Wende. Defendant Bizub is sued in his individual capacity.

14. **Defendant Frank Pfonner** ("Defendant Pfonner") is a Corrections Sergeant at Wende. Defendant Pfonner is responsible for the care, custody and control of inmates and first line of supervision of security staff at Wende. Defendant Pfonner is sued in his individual capacity.

15. **Defendant Joshua Lis** ("Defendant Lis") is a corrections officer employed by DOCCS at Wende. Defendant Lis is sued in his individual capacity.

16. **Defendant Steven Kostyszyn** ("Defendant Kostyszyn") was a corrections officer employed by DOCCS at Wende. Defendant Kostyszyn is sued in his individual capacity.

17. **Defendant Carmen Burkhart** ("Defendant Burkhart") was a corrections officer employed by DOCCS at Wende. Defendant Burkhart is sued in his individual capacity.

18. **Defendant Christy R. Miskell** ("Defendant Miskell") was a corrections officer employed by DOCCS at Wende. She was working in the SDU on December 23, 2020.

19. **Defendant Stephen Diffenderfer** ("Defendant Diffenderfer") was a corrections officer employed by DOCCS at Wende. Defendant Diffenderfer was involved in the April 21, 2021 beating of Mr. Jude in the shower of the SDU.

20.    **Defendant Anthony Scere** ("Defendant Scere") is a corrections officer employed by DOCCS at Wende.  Defendant Scere was involved in the April 21, 2021 beating of Mr. Judge in the shower in the SDU.

21.    **Defendant Conor Ewing** ("Defendant Ewing") is the instructor for the blind who operates the SDU at Wende.  Defendant Ewing is sued in his official capacity.

22.    **Samantha Maragh** ("Maragh") is a Supervising Offender Rehabilitation Coordinator who oversees Defendant Conor Ewing, instructor for the blind in the SDU at Wende.

23.    **Defendant Leah Szablewski** ("Defendant Szablewski") is the Deputy Superintendent of Mental Health at Wende.  For some inexplicable reason, she is currently in charge of reasonable accommodations at Wende.

## FACTUAL ALLEGATIONS

24.    Plaintiff is a fifty-one-year-old, legally blind person registered with the NY State Commission of the Blind.

25.    Plaintiff suffers from advanced bilateral degenerative glaucoma and myopia. He suffers from Diabetes [Mellitus] Type II (adult onset), which causes progressive vision loss, photophobia, or intolerance to light, and, ultimately, incurable blindness in both eyes. Due to Plaintiff's vision loss, he struggles with activities of daily living such as climbing steps, reading, writing, learning, walking, and communicating. Moreover, Plaintiff has also been diagnosed with a learning disability and attention deficit disorder.

26.    DOCCS and its employees are aware of Mr. Jude's legal blindness.  His testing results dated as early as 2011 in his DOCCS medical records verify his legal blindness.

27.    In addition to his sensorial disabilities, Plaintiff wears a custom-molded ankle-to-foot orthotic ("AFO") leg brace on his left leg for a drop foot condition. The device must be

custom-molded as a prefabricated version causes him pain, discomfort, and neuropathy. Without a well-fitting AFO Plaintiff struggles to walk.

28.     Due to his sensorial and physical disabilities, Mr. Jude presents a fall risk and must utilize a blind mobility cane and/or rely on an inmate escort/sighted guide to help him navigate.

29.     As described above, Plaintiff, with or without reasonable accommodations, meets the essential eligibility requirements for receiving services and participating in programs, services, and activities which DOCCS provides and makes available to incarcerated individuals.

30.     Plaintiff meets the requirements for residing in and receiving or participating in services, programming, activities, and appropriate accommodations offered within a DOCCS' SDU.

31.     The SDU in Wende is located in D-Block, a designated "special unit" for vulnerable, Legally Blind/Severely Visually Impaired ("LB/SVI") inmates who participate in Wende's SDU.

32.     To read and write, Plaintiff relies on "auxiliary aids" for persons with impaired vision, including, but not limited to: braille materials and displays; screen reader software; magnification software; large-print materials; 20/20 pens, lined paper, optical readers; and other devices to accommodate the visually impaired.

33.     Plaintiff cannot read well unless he uses a device that is capable of magnifying print size, such as an electronic magnifier known as a closed circuit television ("CCTV"). CCTV devices come in both hand-held and stationary versions and enlarge text to a screen for ease of reading. Some CCTV devices also have auditory capabilities that translate text into audio.

34.     A magnifying glass is ineffective for Mr. Jude's reading needs. Magnifying glasses are intended for "spotting" or "spot checking." Like most visually impaired people, Plaintiff

cannot use a magnifier for long periods of time. When Plaintiff is forced to read with only a magnifying glass, the strain causes him headaches. The magnifying glass is not designed for nor is it compatible with extended use.

35.    After the dissolution of the *Medina I* PSA in 2017, DOCCS immediately rescinded many of the protections and reasonable accommodations afforded by the PSA.

36.    Sensorially disabled incarcerated individuals in DOCCS' SDU programs reached out to civil rights lawyers who worked in the area of prisoner disability rights, including the Prisoner Rights' Project and Plaintiff's current counsel. Disabled incarcerated individuals were very dismayed that the protections and accommodations afforded by the *Medina I* PSA had been rescinded almost wholesale across the DOCCS' SDUs.

37.    At Eastern NY Correctional Facility ("Eastern"), the instructor for the legally blind, Heidi Lewis, used the fact that sensorially disabled prisoners came to her to assist with reading their legal mail to pass along information to DOCCS leadership. While civil rights lawyers tried to circulate questionnaires to ascertain the lack of accommodations suffered by the disabled in legal mail, DOCCS started to compile lists of disabled inmates who were corresponding with these offices.

38.    In December of 2019, Cheryl Morris, the Deputy Superintendent of Programs at Eastern compiled a list of sensorially disabled prisoners who received legal mail from these public interest lawyers and began monitoring them.

39.    Mr. Jude's name was on the list and DOCCS began to track him and his correspondence with lawyers.

40.     Instead of putting their time and energy into curing ADA and Rehabilitation Act violations in the SDUs, DOCCS, through its employees, began intimidating and retaliating against the sensorially disabled.

41.     In fact, DOCCS staff at these facilities spend an unacceptable amount of time trying to de-designate prisoners from the SDU/SDP programs, including taking videos and photographs of them without their knowledge to "prove" the prisoner is not really disabled.

42.     DOCCS staff at these facilities often send disabled prisoners out for eye and auditory examinations with instructions to specialty providers suggesting they should "rule out malingering," or "confirm whether malingering" – directives that do not serve patients, but rather put the disabled person in the constant tension of "proving" they are disabled.

43.     These antics accomplish nothing other than hurting disabled prisoners and violating their rights.

44.     In addition to his sensorial and physical disabilities, Mr. Jude also suffers from mental illness.  Mr. Jude has been treated with various anti-psychotic medications for the management of symptoms related to his diagnosed psychiatric disorders including, schizophrenia, bipolar disorder, anxiety disorder, personality disorder and unspecified mood disorder.  Plaintiff is sometimes treated with pharmaceuticals to manage his symptoms, but nonetheless suffers from sporadic mental health episodes.

45.     Plaintiff's mental health issues can cause him to suffer from command hallucinations, including the hearing of voices and seeing of visions, as well as bouts of lack of self-control and suicidal ideation.

46.     Plaintiff has been treated by the NYS Office of Mental Health (OMH) in various capacities for almost three decades.

8

47.     As described above, Plaintiff, with or without reasonable accommodations meets the essential eligibility requirements for receiving services and participating in programs, services and activities which DOCCS provides and makes available to inmates.

**DOCCS Failure to Reasonably Accommodate**

48.     On or about July 31, 2020, Plaintiff was transferred from Eastern to Wende.

49.     The staff at the Eastern SDU warned the Wende SDU staff of Mr. Jude's arrival, suggesting he was a trouble-maker looking to sue.  In fact, Mr. Jude, like many of the more vocal disabled prisoners was just trying to gain reasonable accommodations for the sensorially disabled that they were entitled to under federal law.

50.     Due to Mr. Jude's status as a sensorially disabled incarcerated individual he can only be housed in a facility with an SDU and SDP – limiting the options to Sullivan, Wende and Eastern Correctional facilities.

51.     DOCCS' Directive 2612, entitled "Inmates with Sensorial Disabilities" designates Wende as an accommodating facility with an SDU.

52.     Accordingly, Wende should have the capability to accommodate the needs of male inmates with sensorial disabilities, including the blind and deaf. These accommodations should include a complete range of auxiliary aids and assistive devices that permit sensorially disabled inmates to participate fully in and have meaningful access to the programs, services, and activities that are made available to non-disabled inmates.

53.     Under current DOCCS' policy, once a patient is identified as an SDP participant, he/she must apply for reasonable accommodations which are then medically verified and approved. The approval of reasonable accommodations should be granted based on recent objective testing as well as the abilities/limitations of the patient.

54.    Once transferred, a patient must start anew with the process of being approved for reasonable accommodations, instead of having previously approved reasonable accommodations continued.

55.    The transfer of an SDU patient from one facility to another is considered a "triggering event" in Directive 2612 mandating a reassessment of reasonable accommodations. This scheme allows untrained SDU or SDP staff to deny reasonable accommodations and/or exclude disabled inmates altogether under the auspice that they no longer require accommodation.

56.    This policy and practice allows for the arbitrary imposition of eligibility criteria and approval of reasonable accommodations from facility to facility.  For instance, an SDU patient who receives a CCTV to read with in the Eastern NY Correctional Facility's SDU program may transfer to the Wende SDU program and lose the reasonable accommodation all together.

57.    Under these policies, DOCCS repeatedly permits civilian, non-medical staff to deny, delay access, and/or modify reasonable accommodations that have already been determined to be medically necessary without a professional re-assessment.

***Denial or Improper Modification of Reasonable Accommodations***

58.    Prior to his transfer to Wende, Plaintiff was housed in the SDUs at both Sullivan and Eastern NY Correctional Facilities where he was medically confirmed to be legally blind and approved for several reasonable accommodations, including, but not limited to: large print forms, mobility instruction, magnifiers for spot reading, a tape/cassette player for audio materials, a talking dictionary, a talking chess set, a portable CCTV device for in cell use, a guidance cane, a lamp, a visor/sunglasses for indoor use, a talking watch, 20/20 pens, a talking calculator, bold lined paper for writing, headphones, and preferred seating.   At Sullivan, Mr. Jude also received a large print typewriter for in-cell use.

59.    On or about July 31, 2020, DOCCS transferred Plaintiff to Wende because it had an SDP.

60.    Plaintiff was housed in the Special Housing Unit ("SHU") a disciplinary unit, in which incarcerated individuals are confined to their cells except for one hour of recreation. Incarcerated inmates in the SHU do not have access to the law library, programming, vocational endeavors, or other incidents of normal prison life.  Inmates spending more than 30 days in the SHU can also participate in cell study.

61.    Incarcerated individuals in the SHU must request law library materials to be delivered to their SHU cell for reference.  Each incarcerated individual is allowed only a maximum of two items that may be kept for 24 hours before the materials must be returned.  Each SHU denizen is also afforded 2 books and 1 magazine.

62.    A mail round is conducted during the 3pm to 11pm shift for incarcerated individuals in the Wende SHU.

63.    SHU inmates also suffer other restrictions, including but not limited to: mechanical restraints any time he is outside his cell, only one non-legal visit per week, and deprivation of personal property except basic supplies.

64.    However, the Wende Special Housing Unit Operations Manual specifically mandates that each cell will be "lighted adequately to permit reading," and each inmate will be given writing materials, headphones/ear buds, any prescriptive devices (such as eyeglasses), some limited personal items and mailing materials.  Incarcerated individuals are also guaranteed the "right to receive and send privileged or personal correspondence."

65.    Nothing changed with respect to Plaintiff's disabilities or medical conditions when Plaintiff was transferred from Eastern NY Correctional Facility to Wende.

66.     Moreover, as a legally blind inmate, Plaintiff was transferred to Wende because it has an SDU/SDP, pursuant to DOCCS' Directive 2612, the ADA, and Section 504, specifically to ensure reasonable accommodation.

67.     On or about August 4, 2020, Defendant Conor Ewing, Wende's instructor for the blind overseeing the SDP at Wende, visited Plaintiff in the SHU to ask Plaintiff to fill out a Reasonable Accommodation Request Form, even though Plaintiff had previously been medically assessed and approved for reasonable accommodations for his medical condition(s).

68.     Mr. Jude's previous medical records and reasonable accommodation verifications were available for Mr. Ewing's reference.

69.     The medical verification of Mr. Jude's legal blindness was conducted by nurse Lara Darling on or about August 6, 2020.

70.     The Reasonable Accommodation Request Form was then taken to Defendant Leah Szablewski.  Defendant Szablewski is not a medical doctor, nor does she have any specialized training to assess or accommodate the legally blind.

71.     Defendant Szablewski subsequently "modified" Plaintiff's Request noting that "inmate has refused specialist since 12/18/2017," a reference that has nothing to do with whether or not Plaintiff is legally blind and requires accommodations and is absolutely untrue.  In fact, Plaintiff did sign a refusal for a 12/18/17 appointment, but attended every other specialty appointment scheduled for him before that date and several thereafter.

72.     Defendant Szablewski denied Plaintiff's reasonable accommodation requests for a a typewriter, a portable CCTV with which to read, and noted that when he was off of SHU status he might then be able to access braille print/braille equipment, as well as a CCTV device in the

resource room.  These denials meant that Mr. Jude would be unable to read while housed in the Wende SHU.

73.    On August 11, 2020 Defendant Ewing returned the RA Request Form with the "modification," to Plaintiff, and informed Plaintiff that Wende "did not have a portable CCTV," which Plaintiff knew was false because Plaintiff had previously been incarcerated at Wende and had previously been issued such a device.

74.    Defendant Ewing attempted to give Mr. Jude a hand-held magnifier to use instead of a CCTV, but as the magnifier is insufficient to aid Mr. Jude in reading and writing, he rejected it.

75.    In fact, Anthony Medina, another legally blind inmate and the lead plaintiff of *Medina I* and *Medina II* was permitted to possess and use a CCTV during his entire stay at Wende, both in the general population and in the SHU, as recently as late 2020.[1] There was no reason to deny Mr. Jude a CCTV with which to read.

76.    Plaintiff appealed the modification and denial to Defendant Eckert for review. Under DOCCS' policies and procedures, the Superintendent may name a Designee to conduct a review of a denied reasonable accommodation.  Defendant Szablewski was named as the designee to conduct a review of her own denials of Mr. Jude's reasonable accommodation requests.

77.    On August 13, 2020, Plaintiff met with Defendant Szablewski who affirmed her own decision to deny Mr. Jude's reasonable accommodation requests.

---

[1] Current *pro bono* counsel for Plaintiff served as *pro bono* counsel for Mr. Medina in *Medina II*, 15-cv-1955 (LAP)(SN) which ended in an almost $600,000 contempt sanction. *See Medina v. Buther*, 15-cv-1955, 2019 U.S. Dist. LEXIS 156139 (Sept. 12, 2019).  This office had to insist that Mr. Medina had access to a CCTV while in the SHU at Wende.  Much like Mr. Jude, Mr. Medina suffers from both photophobia and legal blindness and requires a CCTV to read.

78.    Plaintiff grieved the denial/modification of his reasonable accommodations. However, the grievance was sent to Defendant Szablewski, and it was then denied.

79.    On August 24, 2020 Mr. Jude saw ophthalmologist Barry Epstein, MD who specifically noted "needs portable (CCTV) magnification device," and recommended that Mr. Jude be referred to a low vision specialist.

80.    On the same day, nurse Hope Obertean reviewed Dr. Epstein's recommendation and noted that she emailed Mr. Ewing.  On August 26, 2020 Mr. Ewing brought Mr. Jude a talking book, digital book player, and headphones. But Mr. Ewing did not bring Mr. Jude a CCTV device.

81.    If a sensorially disabled inmate like Plaintiff is confined for disciplinary sanctions – whether housed in the SHU or on keep lock in his own cell – access to accommodating devices is inhibited if not outright denied.  Of course, sighted inmates on keep lock or SHU confinement are not denied the opportunity to read and write.

82.    Even when Plaintiff is not on keep lock or housed in the SHU access to the Resource Room is difficult to gain.  Instead of being "assigned" to the Resource Room at regular intervals, sensorially disabled inmates must request access as a "call out."

83.    A call out can take several days to arrange, meaning sensorially disabled inmates cannot read their mail, write or communicate with ease.  These disabled inmates must then rely on able-bodied inmates or correctional staff to read their personal and legal mail and hope their personal details are not shared or used to exploit them.

84.    Plaintiff was provided a typewriter for in-cell use from 2017 until 2019 while Plaintiff was housed at Sullivan. Plaintiff also had unlimited access to a portable CCTV, which had been consistently provided to Plaintiff for over seventeen years while Plaintiff has been in

DOCCS custody. Plaintiff had access to these assistive devices while housed in both the general population and SHU/Keeplock, upon request.

85.     While on SHU confinement at Wende, Mr. Jude was completely dependent on Defendant Ewing to deign to provide him with accommodating devices so he could read and assist his counsel with various legal matters, including a criminal appeal.

86.     While Plaintiff has counsel for his appeal, he has chosen to submit his own supplemental brief, a practice allowed for criminal appeals even when appointed counsel will be representing the defendant.

87.     While on SHU confinement, Mr. Jude was completely dependent on reasonable accommodations allotted to him from Mr. Ewing which were woefully deficient.

88.     From the start, the relationship between Mr. Ewing and Mr. Jude was fraught. Mr. Ewing began maintaining notes of his interactions with Mr. Jude often including inappropriate remarks about his perception that Mr. Jude could read and was malingering. Defendant Ewing's notes do not reflect a helpful advocate, but rather someone documenting defenses for a lawsuit.

89.     While Defendant Ewing would sometimes provide Mr. Jude with a CCTV device in the SHU, it was for very limited periods of time and if Mr. Jude chose to enjoy his one hour of recreation and Defendant Ewing came to deliver the CCTV at the same time, the device would not be left for Mr. Jude. Mr. Jude would be denied the ability to read for the entire day.

90.     In light of these deprivations and denial of reasonable accommodations, Mr. Jude filed a series of grievances as he required reasonable accommodations in the SHU to read, write and conduct other activities of daily living.

91.     On or about October 9, 2020, Defendant Maragh met with Plaintiff, and informed Plaintiff that his lawyers have been making complaints. She relayed to Mr. Jude that the *Medina*

15

*I* PSA had expired and, therefore, Plaintiff was not entitled to a portable CCTV or typewriter for in-cell use.

92.    Defendants Maragh and Ewing then informed Plaintiff that they were going to do him "a favor" and issue him a portable CCTV, but no typewriter.  Without a typewriter, Mr. Jude has to handwrite on bold lined paper with 20/20 pens.  This is incredibly laborious and takes him three times longer than it would to type.  A sighted individual would also not take so long to write, as he/she would be able to easily review work.

93.    Further, Defendants Maragh and Ewing stated they would only provide Plaintiff access to the portable CCTV for four hours per day, two days per week and "would revisit it if needed."   While sighted inmates in the SHU or keeplock can read and write 24/7, Mr. Jude was not allowed or offered commensurate time due to his lack of reasonable accommodations.  Defendants Maragh and Ewing suggested that he would have access to a SARA device "when he is off keeplock."

94.    Mr. Jude's counseling chronologies maintained by Defendant Ewing show Mr. Jude was also denied access on many of those dates due to Defendant Ewing's failure to arrange delivery of the accommodations.

95.    Plaintiff has been transferred in and out of the SHU for alleged disciplinary reasons at least three times since he was transferred to Wende.

96.    By the time Mr. Jude grieves and presses cognizable failure to accommodate claims related to his SHU or keep lock confinements, he is released from the SHU.  For instance, in this matter, by the time discovery was received and an injunction hearing was scheduled, Mr. Jude was released from the SHU, but will likely return again.

97.     In mid-October of 2020, Mr. Jude was released from SHU custody and housed on the SDU block, but on keeplock, meaning his movement was still restricted.

98.     Unfortunately, even once he was released from the SHU Mr. Jude's access to a CCTV was unreasonably restricted while on keeplock.  While on keeplock, incarcerated individuals are still restricted in their movements, though no longer in SHU.

99.     Instead of supplying Mr. Jude with a CCTV for in-cell use, Defendant Ewing would only allow him to use the machine for four hours twice per week.

100.    Defendant Ewing's notes indicate that there was no reason to limit Mr. Jude's access other than a desire to restrict his ability to craft a potential lawsuit.  On multiple occasions, Defendant Ewing unnecessarily mentions a lawsuit rather than how he can accommodate Mr. Jude.  He also spends considerable ink suggesting that Mr. Jude can, in fact, see well in contravention of years of medical records.

101.    On several occasions, Mr. Judge complained to Mr. Ewing that the limited access to the CCTV was not enough to meet his reading and writing needs.

102.    Defendants Ewing and Maragh then seem to have arbitrarily determined Mr. Jude could have access for a few hours on a third day, still leaving four days when he could not read in his cell at all.  Many times, Mr. Jude was also denied access to the CCTV because he elected to go to the keep-lock yard and enjoy outdoor recreation.  Defendant Ewing would refuse to deliver the CCTV device if Mr. Jude was in the yard, meaning Mr. Jude would have to choose between recreation and reading/writing for the day.

103.    In late December of 2020 Mr. Jude was off of keep-lock but was quarantined on the SDU due to Covid-19.

**Failure to Protect and Retaliation**

104.    The SDU at Wende houses incarcerated individuals who are sensorially disabled, including the severely hard of hearing, deaf, visually impaired, and blind.  Many of the sensorially disabled inmates also have physical disabilities, such as Plaintiff, who is dependent on his assistive device, AFO, for ambulation and/or chronic health issues.

105.    The incarcerated individuals on the SDU are supposed to be assigned porters and mobility aides to help them move through the facility safely and assist them with activities of daily living, including cleaning their cells, organizing document and other tasks complicated by disability.

106.    The SDU denizens are extremely dependent on these porters and mobility assistants, as they are both physically vulnerable and subject to exploitation in the prison setting.

107.    One of the reasons for housing the sensorially disabled in special units is to ensure their safety while allowing them to live in the general population in the least restrictive environment possible.

108.    Defendants Burkhart, Kostyszyn, and other corrections officers are assigned to the SDU to ensure the safe care and custody of the SDU denizens.

109.    On or about December 19-20, 2020, Plaintiff and other SDU denizens wrote letters to Margaret Stirk, and Defendants Brown, and former Superintendent Eckert regarding Inmate John Roberts, who was threatening violence against sensorially disabled inmates, stealing their property, and extorting and intimidating them with weapons.

110.    Defendant Barlow had authorized corrections officers, including Defendants Kostyszyn and Burkhart, to allow Roberts to "lock out" of his cell and move around the Block unsupervised and function as a "porter."

111.    A "porter" is an inmate assigned to perform various functions within the block or tier/housing unit, including: cleaning, passing out water and food trays, etc.

112.    Inmates Roberts and Rudy Montour were known to be SRG members with a propensity for violence, and therefore should not have been permitted to be housed in a unit designated for LB/SVI inmates, nor permitted to serve as porters.

113.    "SRG" is a term used to mean "Security Risk Group," and refers to a group of inmates designated by the Commissioner and/or security administration who possess common characteristics which serve to distinguish them from other inmates and pose a known threat.

114.    On December 23, 2020, Defendant Barlow, D-Block area supervisor, summoned Plaintiff to the front of the SDU.

115.    Defendant Barlow stated that "Security" had received Mr. Jude's letters alleging that Plaintiff had scalding hot liquid thrown in his face, a bucket of dirty mop water with urine and feces thrown in his cell and was punched in the nose while in the SDU – all by Inmates Brown, Montour and their allies. Officers had failed to report each of these incidents and allowed them as regular occurrences.

116.    Defendant Barlow informed Plaintiff that he "could not care less if inmates killed each other, as long as [his] staff was not touched, which was [his] paramount concern."

117.    Defendant Barlow further advised Plaintiff to either "get with the program, stop filing grievances and complaints" or else Plaintiff would find himself back on keeplock, or officers could find another weapon in his cell and Plaintiff could be returned to SHU.   He added that Jude should "ask [his fellow convicts] what happens to inmates who like to file grievances and complaints at Wende."   And, Barlow suggested that Jude's claims were not that serious because they were a regular occurrence at Wende.

118.   Plaintiff asked Defendant Barlow to move either Plaintiff or Inmate Roberts from the SDU.  Plaintiff also added that his safety and life would be in danger if he or Roberts were not moved.

119.   However, Defendant Barlow advised Plaintiff that he was unable to move anybody at the time due to the SDU being on lockdown because of the COVID-19 pandemic.

120.   Defendant Barlow told Plaintiff to go lock back into his cell, and that Defendant Barlow would see what he could do after consulting with Defendant Hodges.

121.   Defendant Barlow knew or should have known about the threat and risk of harm to Plaintiff's safety, because of the offenses already committed against him, which Plaintiff had consistently reported, as well as similar offenses against other incarcerated individuals.

122.   Defendant Barlow called Defendant Burkhart, the D-Block Captain about a half hour later, and instructed him to have Inmate Roberts' cell searched and to have Inmate Roberts locked in.  Barlow also instructed that Roberts could no longer function as a porter due to slips being dropped alleging Roberts extorted, threatened and assaulted SDU inmates.

123.   Defendant Burkhart conveyed Defendant Barlow's instructions to Defendant Kostyszyn, after which they both called Inmate Roberts to the gate and informed him of Defendant Barlow's instruction.

124.   Defendant Kostyszyn told inmate Roberts he was also instructed to search Roberts' cell, but Defendant Kostyszyn refused to search the cell, and instead told Inmate Roberts to take the sheets off of his bed to make it appear to have been searched.

125.   Inmate Roberts immediately began to walk down the housing unit, speaking in a loud voice to Plaintiff's neighbors that the officers had just informed him he could no longer lock

out of his cell to function as a porter due to inmates "dropping slips" on him and "snitching" on him.

126.    Inmates Roberts and Montour approached another visually impaired inmate returning from the yard, Kasiem Williams. Inmate Montour threatened Mr. Williams with bodily harm if he found out Williams was one of the inmates responsible for dropping slips.

127.    Inmate Roberts was pacing the gallery and making general threats towards any inmates responsible for dropping slips on him, which Defendant Kostyszyn could easily hear.

128.    After Defendant Barlow returned to D-Block, inmate Roberts spoke with Defendants Barlow, Burkhart, and Kostyszyn.  The Defendants told Inmate Roberts that Plaintiff was the one who had "dropped slips."

129.    Defendants' actions subjected Plaintiff to an imminent threat of serious harm.

130.    Inmate Roberts then yelled: "Inmates on this tier want to fuck up my bid by dropping slips on me, snitching on me, having me locked in as porter, I am in turn going to fuck up your lives," which Defendant Kostyszyn could also hear.

131.    Defendant Kostyszyn, upon doing his facility count, stopped by Inmate Montour's cell and asked Inmate Montour whether he wanted to lock out of his cell and be his porter.  He asked loudly enough so everyone could hear.

132.    Upon finishing the count, Defendant Kostyszyn opened Inmate Montour's cell so he could serve the lunch trays, as the entire block was on feed in status due to a Covid-19 quarantine.

133.    After inmate Montour finished passing out the food trays, instead of locking back in his cell per policy, Defendant Kostyszyn allowed Inmate Montour to stay out his cell and linger.

134.    At approximately 12:45pm Defendant Kostyszyn opened up Plaintiffs' cell so that Plaintiff could use the phone and tablet kiosk.

135.    Plaintiff proceeded to the kiosk, and Inmate Roberts—whose cell was right in front of the phone and next to the second shower—called out to Defendant Kostyszyn to be let out of his cell to shower and use the slop sink.

136.    Defendant Kostyszyn got up from the desk and opened up Inmate Roberts's cell.

137.    Plaintiff then notified Defendant Kostyszyn that he was finished using the phone and wanted to return to his cell.

138.    Plaintiff was walking back to his cell when he was suddenly blindsided and struck in the head from behind by Inmate Roberts. The strike knocked Plaintiff to the ground. Inmate Roberts held a metallic instrument in his hand, and, while Plaintiff lay on the ground defenseless, inmate Rudy Montour began to attack Plaintiff with his hands and feet, striking Plaintiff about the head, face and body. Plaintiff screamed out repeatedly for help throughout the attack. His face was slashed.

139.    Defendant Kostyszyn and Defendant Christy Miskell, an officer also on duty on the SDU, failed to act altogether, and stood idly by observing the attack.

140.    The Defendant officers did not even initiate their personal alarms pursuant to DOCCS' policy and procedure.

141.    Inmate Roberts, while stomping Plaintiff, began yelling out gay slurs, calling him a "rat faggot bastard," while Defendants watched from behind the locked gate and did not make any attempt to defuse and/or prevent the attack or even employ any verbal warnings. Plaintiff lost consciousness.

22

142.    Plaintiff eventually regained consciousness, and proceeded to get up off the floor, whereupon Defendant Kostyszyn finally opened the gate and entered the unit.

143.    Plaintiff picked up his blind mobility cane, and turned and asked Defendant Kostyszyn, "Why didn't you help me or activate your body alarm?" Plaintiff received no response.

144.    Plaintiff proceeded to walk back to his cell, with Defendant Kostyszyn following behind, and once Plaintiff stepped inside his cell to grab a cloth to stop the blood flow from his face, Defendant Kostyszyn closed Plaintiff's cell gate, locking Plaintiff in his cell after he had just been wounded.

145.    Approximately 8 to 10 minutes later, Defendant Barlow appeared in front of Plaintiffs' cell laughing, and stated that Plaintiff should have been bobbing and weaving. Defendant Barlow began taunting Plaintiff by shadow boxing in front of Plaintiff's cell.

146.    Defendant Barlow then ordered Plaintiff to get dressed in order that he could be taken to the Regional Medical Unit, "RMU." Inmate Williams assisted Plaintiff to the hospital.

147.    As Plaintiff was exiting the tier/company, Inmate Roberts was on his gate laughing, and blurted out, "Yeah, I seen him attack inmate Montour," who was locked in the first shower area with the slop sink.

148.    Plaintiff saw a Nurse in the RMU.

149.    The Nurse determined that Plaintiff needed to be sent to an outside hospital due a likely concussion based on his vomiting, feeling vertigo, and the extensive head and facial trauma he sustained.

150.    Plaintiff was asked whether he wanted to write a statement, to which Plaintiff replied "Yes," while in Defendant Barlow's presence.

151.    Plaintiff wrote on the inmate injury report: "I was jumped and stabbed in the face by inmate Roberts and another SRG Crips gang member due to the C.O.'s telling Roberts I dropped slips on him and the C.O.'s set me up to be attacked an assaulted and stood idly by and allowed to occur on a legally blind Sensorial Disable Unit, SDU on 24 Co." Plaintiff also wrote on the top of the page: "I WANT TO PRESS CHARGES."

152.    Plaintiff requested that Defendant Barlow take pictures of his injuries, which Defendant Barlow was hesitant to do, until Plaintiff insisted that pictures be taken in front of the RMU Sergeant who stated that "he would do it." Only then did Defendant Barlow state, "No, I will do it," and went and retrieved the camera.

153.    Defendant Barlow took pictures of Plaintiff's head and face but refused to photograph Plaintiff's body or hands as requested by Plaintiff.

154.    Plaintiff requested to be able to speak to Defendant Barlow alone, who dismissed the other officer present and closed the medical treatment room door.

155.    Plaintiff did not want the other officers present to hear what he had to say and report back to Defendant officers in D-block. However, Plaintiff believed that could confide in Defendant Barlow as the area supervisor.

156.    Plaintiff explained in detail to Defendant Barlow what had transpired since they spoke earlier.

157.    Mr. Jude suffered a ½" deep laceration above his left eye. He also suffered severe contusions to his head and about his body and lost consciousness.

158. Mr. Jude was transported to Erie County Medical Center emergency room where he received sutures and diagnostic testing revealed a subgaleal hematoma on the right side of his head.

159. When Mr. Jude was seen by Nurse Cavanaugh on December 31, 2020, she noted that Mr. Jude was complaining of lasting pain in his left arm, shoulder and back due to the assault. Mr. Jude's complaints of pain lasted for several months.

160. Directly after the attack, Defendant Kostyslyn planted weapons in Mr. Jude's cell while conducting a "cell search."

161. Mr. Jude was issued a disciplinary ticket for allegedly fighting and possessing weapons in his cell and was transferred to the SHU once released from the infirmary and a COVID quarantine.

162. On December 24, 2020, Defendant Ewing recorded, "The D-Block officers notified me that inmate Jude was involved in an altercation with another inmate last night that led to inmate Jude receiving serious enough injuries that he was removed to an RMU for treatment. When the officers were packing up/searching his cell they found his talking book player, and his land and bulb….they also found numerous weapons, which should lead to SHU time. My supervisors and I will have to re-evaluate if he can receive the . . . CCTV while housed in the SHU as it is a Class A tool."

**April 2021 - Excessive Force, Conditions of Confinement and Retaliation**

163. On April 27, 2021, at approximately 9:30am, Plaintiff got into a verbal dispute with Defendant Brown in the SDU.

164. Defendant Brown did not like that Plaintiff had challenged his authority, and immediately retaliated against Plaintiff by ordering a suspicious cell search of his cell in order to

have Plaintiff set up with a weapon and get him moved to the SHU. Defendant Brown sent C.O. Thomas White to set Plaintiff up.

165.    Plaintiff has never been in possession of a weapon in over thirty-seven years in DOCCS custody, and has never been disciplined for having a weapon until he was transferred to Wende and started filing grievances and complaints.

166.    In fact, Defendants have a pattern and practice of setting inmates up with weapons, as well as having them attacked by other inmates, and filing false misbehavior and incident reports to cover their wrongdoing.

167.    After the interaction with Defendant Brown, Plaintiff went to the SDP Resource Room and when he returned to his cell at 11:40am, Defendant Frank Pfonner, "E" and "C" Block supervisor, was waiting for Plaintiff at the door to "D" Block.

168.    Defendant Pfonner informed Plaintiff that he had to go into the shower because Plaintiff's cell had been searched and a weapon was found in his cell.

169.    Plaintiff's cell was allegedly searched by C.O. Thomas White, who Plaintiff was informed was a Crisis Intervention Unit officer.

170.    Plaintiff was locked in the shower during the further search of his cell.  Defendant Pfonner came to handcuff Plaintiff and take him to the SHU. Plaintiff resisted being handcuffed, and Defendant had the shower opened and Defendant Pfonner and Officers Joshua Lis, Stephen Diffenderfer and Anthony Scere came into the shower and began hitting Plaintiff with closed fist punches to the head and face, causing Plaintiff to fall down.

171.    Defendants continued to punch and kick Plaintiff as he lay on the ground. Defendant Pfonner then stated, "That's enough, that's enough."

172.    Defendants had caused a gash over Plaintiff's eye, and seriously injured Plaintiff's nose. Defendants wholly denied Plaintiff medical attention for his injuries other than a superficial visit with a nurse.

173.    Defendant Brown then lied at Plaintiff's Tier III Disciplinary Hearing and stated that he didn't order these two unnecessary uses of force, and that former Superintendent Stewart Eckert ordered the use of force.

***Fourteenth Amendment Due Process Violation***

174.    On July 1, 2021, Defendant Lockwood, presided over Plaintiff's Tier III Disciplinary Hearing for the April 27, 2021 weapons charge.

175.    Defendant Lockwood conducted the hearing without Plaintiff present while Plaintiff was in the MHU observation cell, and falsely claimed that Plaintiff refused to attend his hearing.

176.    Plaintiff was not granted the opportunity to call or question witnesses, have the assistance of an aid, or present a defense.

177.    Plaintiff was found guilty and given eight months SHU and six months recommended loss of good time and eight months loss of privileges.

178.    In January of 2022, the charges were reversed and expunged after Plaintiff filed an Article 78 proceeding.

179.    Plaintiff spent eight months in the SHU for the April 2021 retaliatory weapons possession charges.

180.    While in the SHU Mr. Jude was only allowed one hour of recreation, was denied personal possessions beyond the basic, the freedom of movement he would enjoy in general population, programming, access to the law library and resource room as well as a severe

deprivation of his reasonable accommodations – meaning his ability to even read and write was limited.  Mr. Jude's access to a CCTV device was constructively denied and greatly curbed due to the justification that it was a "Class A" device and could not be possessed by an incarcerated individual while housed in the SHU.

***Retaliation for Filing Suit***

181.    On May 19, 2021 Mr. Jude filed his original *pro se* complaint.

182.    Defendants Brown, Kostyszyn, Barlow and Burkhart were served on June 14, 2021.

183.    On July 1, 2021, Defendant Robert Bizub lured Plaintiff out of his cell by telling Plaintiff that he had a dental call out at 11:45am. Plaintiff got dressed and went to the RMU, but instead of going to dental, Plaintiff was taken into the medical examination room where he was told by a staff nurse that Defendants had stated he was slurring his speech, when in fact Plaintiff was just in pain due to a dental problem.

184.    Plaintiff was asked by a nurse whether he could be examined, and Plaintiff said "no," because he was having a dental problem, not a medical problem. Plaintiff explained that he had previously been brought to medical by Defendant Bizub in May 2021, also without reason.

185.    The nurse asked whether she could take Plaintiff's blood pressure, Plaintiff allowed her to do so, and the nurse stated that Plaintiff's blood pressure was low and went and got Dr. Shahid Haque, a clinical physician.

186.    Dr. Haque asked to examine Plaintiff, and Plaintiff declined to be examined. Dr. Haque stated that Plaintiff's blood pressure was low and that they would like to monitor Plaintiff overnight in the RMU.  Plaintiff refused and explained that he didn't want to be in the infirmary overnight.

187.    Defendant Bizub informed Plaintiff that he could bring his SHU tablets to the RMU, that they had Wi-Fi and that he could have Defendant Ewing bring his reasonable accommodations and that it was for Plaintiff's health, so he should go.

188.    Plaintiff agreed to be admitted to the RMU to have his blood pressure monitored for twenty-four hours. Plaintiff was placed, uncuffed, in a medical room, and remained there for approximately two hours. However, after approximately two hours, staff came to Plaintiff's room and stated that he would be stripped down and placed in an RMU one-on-one suicide watch cell, despite the fact that Plaintiff never stated he was feeling suicidal.

189.    Plaintiff called for Dr. Haque in hopes of finding out what was going on and sign a refusal to go back to his cell.

190.    Instead, Defendant Brown dragged Plaintiff, handcuffed, to the mental health unit and placed him in a dirty, feces-smeared cell.

191.    Defendants removed the mattress from the cell, removed Plaintiff's smock and slippers, and placed Plaintiff on food, water, and light deprivation and forced Plaintiff to lay naked on a cold, metal bed frame for seven days. This treatment served no penological purpose.

192.    Defendants also removed and lost Plaintiff's AFO.

193.    Plaintiff was informed that these deprivations were ordered by Defendant Brown in response for Plaintiff's filing of this lawsuit.

194.    Defendant Brown was attempting to intimidate Plaintiff. Plaintiff was told that DOCCS security staff intercepted a letter Plaintiff sent to his attorney stating he had planned to commit suicide due to the retaliation and denials of reasonable accommodations. [2]

---

[2] Shockingly, Defendants do not even pretend they were not monitoring Mr. Jude's privileged mail and tendered a copy of a privileged letter in opposition to the Temporary Restraining Order application – a somewhat brazen move.

195.    During the week in mental health observation, Plaintiff was subjected to deprivations of food, water, and clothing which served no conceivable penological purpose, including being left naked on a bare, metal bed frame for seven days, with no food or water, forcing Plaintiff to drink from the toilet.

196.    These "deprivations" were ordered by Defendant Brown as retaliation for filing this action.

197.    During another "contraband watch" ordered by Defendant Brown in August of 2021, a nurse clearly noted, "Taken off the contraband watch and put on a 1:1 suicide watch as per Dep Brown."

198.    There is no rational explanation for Defendant Brown making medical determinations regarding Mr. Jude's mental state or medical care decisions.

199.    The retaliation and abuse Mr. Jude suffers at Wende has continued even since the Court's August 11, 2021 Temporary Restraining Order.

### FIRST CAUSE OF ACTION
### *42 U.S.C. § 1983 – Failure to Protect*
### (Against Defendants Barlow, Burkhart, Stirk, Kostyszyn and Miskell in their individual capacities)

200.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

201.    Defendants Stirk, Barlow, Burkhart and Kostyszyn were aware of the imminent risk to disabled incarcerated individuals housed on the SDU by Inmates Brown and Montour.

202.    SDU denizens had sent numerous letters, communicated verbal concerns and filed numerous complaints regarding the abuse to Defendants.

203.    Nonetheless, Defendants did nothing to protect the disabled prisoners on the SDU.

204.    On December 23, 2020, specifically, Defendants Barlow, Burkhart and Kostyszyn identified Plaintiff to Inmate Roberts as a "snitch" knowing full well such disclosure would put Mr. Jude in imminent danger.

205.    Instead of following proper protocol, Defendant Kostyszyn allowed Inmates Montour and Roberts to be out of their cells while Mr. Jude was also out of his cell.

206.    When Inmates Montour and Roberts viciously attacked Mr. Jude, Defendants Kostyszyn and Miskell stood by and watched while Mr. Jude was beaten.

207.    Defendants did nothing to protect Mr. Jude from foreseeable and known danger.

### SECOND CAUSE OF ACTION
*42 U.S.C. § 1983 – First Amendment Retaliation*
**(Against Defendants Brown, Bizub, Ewing, Szwalewski and Maragh in their individual capacities; against Daniel F. Marusello in his official capacity as Commissioner of DOCCS solely for injunctive relief purposes)**

208.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

209.    After the pro se Complaint was filed in this matter, Defendant Bizub lured Plaintiff from his cell under the guise that he had a dental appointment.

210.    Instead of taking him to dental, Defendant Bizub took Plaintiff to the RMU where he indicated that Mr. Jude could have his tablet and legal materials if he stayed there for monitoring of his blood pressure.

211.    Instead of arranging for his accommodations, Bizub and Brown demanded that Mr. Jude be put on a 1:1 suicide watch in the mental health observation cell.

212.    The extracted Mr. Jude from an RMU examination room to mental health observation room where he was deprived of a mattress, fresh water, food and care for seven (7) days.

213.    Mr. Jude was specifically told Defendant Brown had ordered the suicide watch in retaliation for the filing of this litigation.

214.    Defendants Ewing, Szwalewski and Maragh were responsible for the assessment and provisioning of reasonable accommodations to Mr. Jude.

215.    Instead of reasonably accommodating Mr. Jude's disabilities, Defendants Ewing, Swalewski and Maragh denied and modified necessary accommodations due to fear that Mr. Jude was planning on a lawsuit.

216.    Mr. Ewing specifically recorded (over and over) in Mr. Jude's counseling chronology self-serving descriptions of Mr. Jude's litigiousness and desire to sue instead of details about his accommodation needs.

217.    Defendants Ewing, Szwalewski and Maragh denied Mr. Jude reasonable accommodations such as access to a CCTV that would ensure Mr. Jude was able to read, write and communicate on par with non-disabled prisoners in retaliation for perceived threats of litigation and the filing of grievances.

### THIRD CAUSE OF ACTION
### *42 U.S.C. § 1983 – Fourteenth Amendment Due Process - Sandin*
### (Against Defendant Lockwood in his individual capacity)

218.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein

219.    Defendant Hodge conducted a Superintendent's disciplinary hearing to adjudicate misbehavior tickets charging Mr. Jude with possession of contraband – a weapon.

220.    Defendant Hodge denied Mr. Jude the right to be present for the hearing, suggesting that he had "refused" to attend, when in fact he was in observation.

221.    Defendant Hodge denied Mr. Jude the right to question witnesses and the right to prepare a proper defense.

222.    Defendant Hodge then adjudicated Mr. Jude guilty despite these due process violations and sentenced him to 90 days in the Special Housing Unit.

223.    In the Special Housing Unit, Mr. Jude was restricted to his cell 23 hours a day, denied free use of the law library, the Sensorially Disabled Resource Room, commissary, communication privileges, and proper reasonable accommodations so he could read and write like other inmates on SHU confinement.    Mr. Jude was also denied anything other than basic necessities.

## FOURTH CAUSE OF ACTION
*42 U.S.C. § 1983 – Eighth Amendment Excessive Force*
**(Against Defendants Pfonner, White, Lis, Diffenderfer and Scere in their individual capacities)**

224.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

225.    On April 27, 2021 while Mr. Jude was in the SDP Resource Room, Defendant Brown arranged a cell search and the planting of a weapon in his cell.

226.    When Mr. Jude returned to the SDU, Defendant Pfonner told him that he had to wait in the shower because his cell was still being searched.

227.    Defendant Pfonner then came and handcuffed Mr. Jude, after which Defendants Lis and John Doe 1 entered the shower area and began hitting Plaintiff with closed fist punches and kicking him.

228.    Mr. Jude was handcuffed and there was no penological reason for the beating.

229.    Defendants then lied and suggested that Mr. Jude's injuries were self-inflicted.

**FIFTH CAUSE OF ACTION**
*Americans with Disabilities and Rehabilitation Acts – Failure to Accommodate*
**(Against New York State Department of Corrections and Community Supervision, and**
**Defendants Ewing, Maragh and Szewalski in their official capacities)**

230.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

231.    Mr. Jude is sensorially disabled by his legal blindness.

232.    To read and write effectively he requires accommodating devices, including a CCTV to read and write for long periods of time.

233.    Mr. Jude had a history of being provided with a CCTV and other accommodating devices, including large key typewriters, and access to SARA devices in DOCCS' SDP Resource Rooms.

234.    Despite Mr. Jude's well-documented need for these reasonable accommodations, Defendants Szewalski, Ewing and Maragh either denied out right or greatly curbed Mr. Jude's access to reasonable accommodations.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment in his favor as follows:

235.    Awarding compensatory and punitive damages.

236.    Awarding Plaintiff's reasonable attorneys' fees, costs, disbursements, and other litigation expenses, pursuant to 29 U.S.C. § 794(b), 42 U.S.C. § 12205 and 42 U.S.C. § 1988(b).

237.    Awarding permanent injunctive relief pursuant to which DOCCS (in the name of Daniel F. Martuscello) must house Mr. Jude at any other DOCCS facility other than Wende Correctional Facility.

238.     Ordering such other and further relief as the Court may deem just and proper.

Dated:     October 17, 2023

**LAW OFFICE OF AMY JANE AGNEW, P.C.**

By: */s/ AJ Agnew*
Amy Jane Agnew
*Pro Bono Counsel for Plaintiff*
24 Fifth Avenue, Suite 1701
New York, New York 10011
(973) 600-1724
aj@ajagnew.com

*\*Plaintiff's counsel is extremely grateful to Ms. Kristen Crow and Mr. Joseph Donaldson, both law students at University Buffalo School of Law, for their assistance in amending the Complaint and ably representing Mr. Jude through their clinic.*